IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CONTRACTOR TOOL SUPPLY, INC.,
a/k/a Vera Tools, a Florida for-profit
corporation,

      Plaintiff,

v.

JPW INDUSTRIES, INC., a Washington
for-profit corporation,

      Defendant.
_____/

Case No.:

## COMPLAINT

Plaintiff, CONTRACTOR TOOL SUPPLY, INC., a/k/a Vera Tools, a Florida for-profit corporation ("Plaintiff" or "CTS"), by and through its undersigned counsel, hereby sues Defendant, JPW INDUSTRIES, INC. ("Defendant" or "JPW"), and alleges:

1. This action arises from JPW's illegal attempts to vertically fix prices to unreasonably restrain competition.

### Parties, Jurisdiction, and Venue

2. Plaintiff, CTS, is a Florida for-profit corporation with a principal place of business in Lake County, Florida.

3. Defendant, JPW, is a Washington for-profit corporation with a principal place of business in Rutherford County, Tennessee. At all relevant times, JPW conducted substantial business within the Middle District of Florida.

4. Upon information and belief, non-party Amazon.com, Inc. ("Amazon"), is a Delaware corporation with a principal place of business in King County, Washington. At all relevant times,

1

Amazon conducted substantial business within the Middle District of Florida.

5. Federal question jurisdiction exists under 28 U.S.C. § 1331 because this action involves claims for violations of federal antitrust laws.

6. Supplemental jurisdiction exists under 28 U.S.C. § 1367 because the state law claims asserted in this action arise from the same case or controversy as the federal antitrust claims asserted in this action.

7. Diversity jurisdiction also exists under 28 U.S.C. § 1332 because the parties reside in different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest, attorneys' fees, and costs.

8. This Court may exercise personal jurisdiction over JPW because JPW transacts substantial business in and provides goods and/or services in the State of Florida.

9. Venue is proper in the Middle District of Florida, pursuant to 15 U.S.C. § 22, because the unlawful acts alleged in this Complaint occurred within the Middle District of Florida.

10. All conditions precedent to this action have been fulfilled, waived, or otherwise satisfied.

## The Marketplace for Woodworking and Metalworking Tools

11. CTS is engaged in the business of, *inter alia*, purchasing and reselling woodworking and metalworking tools to customers within the United States.

12. JPW manufactures woodworking and metalworking tools as well as related accessories (collectively, the "Products") under reputable brand names, including Axiom, Baileigh, Edwards, JET, Powermatic, and Wilton.

13. Known for their unique and specialized Products, JPW is recognized as the top manufacturer of woodworking and metalworking tools throughout the United States.

14. JPW maintains significant market power throughout the United States as the parent company for the multiple brand names of the Products.

15. Woodworking and metalworking tools comprise the relevant product market, or submarket, separate and distinct from the general market for tools, because they are highly specialized, unique, and not interchangeable with other types of tools.

16. The relevant geographic market is the United States.

17. Distributors like CTS generally purchase woodworking and metalworking tools directly from JPW as well as other manufacturers who participate in the market.

18. Distributors like CTS resell the Products in interstate commerce through brick-and-mortar stores as well as online to customers throughout the United States.

19. Distributors like CTS typically purchase and resell all major brands of woodworking and metalworking tools. A distributor who cannot supply JPW's brands of woodworking and metalworking tools is at a competitive disadvantage compared to a distributor who is able to supply all major brands.

20. Customers expect distributors like CTS to use their expertise, knowledge, and customer services to help them find the right woodworking and metalworking tools for their needs. If a distributor does not carry all major brands, then that distributor cannot provide its customers with the most appropriate tools for specialized projects.

21. CTS sells some of JPW's Products through its brick-and-mortar store located in Lake County, Florida, as well as through CTS's website (www.contractortool.com).

22. Through its website (www.amazon.com), Amazon dominates approximately fifty percent (50%) of the online marketplace. As a result, a tool distributor who cannot sell on Amazon is at a severe competitive disadvantage.

23. CTS has expended considerable time and money to develop the Vera Tools Storefront on Amazon.com.

24. A significant portion of the Products sold by CTS are sold through the Vera Tools

Storefront.

25. While distributors like CTS are free to develop their own storefronts on Amazon's website, Amazon itself sells a wide array of woodworking and metalworking tools, including JPW's Products. As a result, Amazon is a direct competitor of CTS.

26. Before the Products may be sold on the Vera Tools Storefront, Amazon requires that CTS provide information about the pricing for the tools, including whether the tools are subject to a Minimum Advertised Price ("MAP") policy imposed by a manufacturer.

27. A MAP is the lowest price at which a manufacturer allows its products to be advertised by distributors in marketing and promotional materials. It represents a floor for advertising, not necessarily the selling price.

28. If a customer is logged into his or her Amazon account and searches for a tool subject to a MAP, Amazon displays the advertised price. However, the distributor may opt to lower the price once a customer adds the tool to the online cart for purchase.

29. If a customer is not logged into his or her Amazon account and searches for a tool subject to a MAP, Amazon does not display a price, but directs the customer to see the price displayed in the cart.

30. Regardless of when the customer sees the actual price on Amazon's website, CTS does not advertise or market any of the Products to the public below the MAP.

31. Once a customer adds one of the Products to their cart on Amazon's website, distributors like CTS enjoy the freedom to discount the price below the MAP to solidify the customer's decision to buy the specialized tool.

### JPW's Historical Course of Dealing with CTS

32. On or about November 2021, JPW offered CTS in writing "Preferred Vendor Status" and agreed to sell its Products to CTS in accordance with the terms of the Sphere 1 Preferred Vendor

4

Agreement & Program.

33. Preferred Vendor Status qualifies distributors like CTS to higher rebates, lower pricing, and other favorable terms if they meet certain sales volume benchmarks.

34. Under the Sphere 1 Preferred Vendor Agreement & Program, CTS and JPW developed a mutually beneficial business relationship.

35. During the course of the relationship, CTS purchased nearly $10 million worth of Products from JPW and dramatically expanded the sales volume of the Products.

36. For example, in 2022, CTS purchased over $1.9 million in Products from JPW.

37. In 2023, CTS purchased over $6.3 million in Products from JPW.

38. During the parties' business relationship, representatives of JPW repeatedly praised CTS for dramatically increasing the sales of JPW's Products.

39. On many occasions through 2023 and early 2024, Brett Kenzler, the Regional Manager for JPW whose region included CTS, told Matt King, President of CTS, that CTS helped JPW meet its sales and bonus goals, that CTS was a top partner of JPW, and that CTS was the third largest source of sales for JPW.

40. Jillian Cherry, Director of eCommerce for JPW, made similar statements to Matt King in late 2023.

41. In late 2023, JPW and CTS renewed the Sphere 1 Preferred Vendor Agreement & Program to continue the manufacturer-distributor relationship into 2024. A copy of the 2024 Sphere 1 Preferred Vendor Agreement & Program (the "Contract") is attached as Exhibit "A."

42. Relying on the Contract, CTS embarked on a marketing campaign intended on selling over $10 million of JPW's Products in 2024.

43. By the end of March 2024, CTS had already secured sales for $2 million of JPW's Products.

**The Amazon/JPW Agreement**

44. While CTS generated significant profits for JPW, CTS's aggressive marketing and competitive pricing strategy eroded Amazon's ability to sell JPW's Products at higher prices.

45. By information and belief, in early 2024, Amazon pressured JPW to breach the Contract with CTS. Specifically, Amazon began to "charge back" JPW for the sales of JPW's Products that Amazon believed it lost to CTS.

46. By information and belief, on or about February 2024, Amazon's representatives met with Jillian Cherry and Nate Morrison, Vice President of JPW, to discuss ways to control resale pricing of JPW's Products and to prevent CTS from selling in a manner that put pressure on Amazon and JPW's margins.

47. By information and belief, Amazon and JPW agreed that JPW would unilaterally alter the terms of the Contract, charge new fees to CTS that were not imposed on Amazon and other distributors, and prevent CTS from selling JPW's products at prices lower than the advertised prices.

48. Both Amazon and JPW benefited from this anticompetitive agreement.

49. Amazon wished to maintain higher prices for JPW's Products and to eliminate CTS as a competitor. By forcing CTS to raise its prices, Amazon intended to eliminate downward pressure on its own retail margins on JPW's Products caused by CTS's resale pricing.

50. By controlling pricing and directing JPW to increase CTS's costs, Amazon also intended to supplant CTS as the primary online seller of JPW's Products.

51. JPW wished to maintain higher prices for its Products. While JPW sought to increase the sales volume for its Products, it did not want the increased sales to result in decreased profit margins.

**JPW's Anticompetitive Conduct**

52. Pursuant to its agreement with Amazon, JPW attempted to impose new, anticompetitive policies on CTS in violation of the Contract.

6

53. In late February 2024, Jillian Cherry informed Matt King in a phone call that Amazon was "causing a headache" for JPW because Amazon was concerned about CTS's online sales.

54. On March 11, 2024, Nate Morrision sent an email to Matt King. While the stated purpose of the email was to memorialize a recent phone call, Nate Morrison grossly mischaracterized the conversation and proposed a vertical price-fixing agreement that was not discussed on the phone.

55. Nate Morrison's email stated:

> **Thanks for the time on Friday. Just to recap our call and ensure agreement:**
>
> - **JPW and CTS will continue our relationship with the brick & mortar construction business:**
>   - **This business will be managed by our field sales team and will receive Sphere 1 benefits**
>   - **CTS.com to follow the JPW MAP policy which includes "Price in Cart" as a violation**
>   - **Future orders will need to follow Sphere 1 terms of 1% 15 NET 30; credit card payments would require adder to account for additional fees**
>   - **We need to confirm which account number will be used for B&M business so that we can accurately adjust rebates and sales goals for CTS, Sphere 1 and JPW teams**
>
> - **JPW and CTS/Vera will not partner on Amazon 3P business:**
>   - **JPW would expect <5% of overall CTS sales to be sold through Amazon or other marketplaces**
>   - **This business will be managed by JPW's eCommerce team**
>   - **Vera Tools to follow the JPW MAP policy which includes "Price in Cart" as a violation on all marketplace platforms**
>   - **Not discussed, but we do not want CTS/Vera Tools selling/stocking through Amazon [FBA] VBA**
>
> **Are we in agreement with the go forward plan and terms?**

A true and correct copy of the March 11, 2024 email is attached hereto as Exhibit "B."

56. Each of the terms in the March 11, 2024 email was intended to fix the prices for JPW's

7

Products and/or to impose new costs on CTS that were not specified in the Contract or imposed on Amazon.

57. By twice including "Price in Cart" as a violation of JPW's so-called "MAP policy," JPW effectively proposed a resale price maintenance agreement.

58. By imposing additional fees for credit card payments, JPW intended to raise CTS's costs and to force CTS to pass those additional costs along to customers.

59. By limiting the Sphere 1 rebate to sales generated through CTS's brick-and-mortar store, JPW effectively revoked CTS's Preferred Vendor Status with respect to sales on Amazon's website.

60. By attempting to "adjust rebates and sales goals for CTS," JPW further confirmed its intent to not honor CTS's Preferred Vendor Status as well as the terms of the Contract.

61. By expecting that CTS would generate less than five percent (5%) of its sales through Amazon's website, JPW sought to remove CTS as a significant competitor of Amazon.

62. By requiring CTS's Amazon Storefront business to be managed by JPW's eCommerce Team, JPW sought to dictate when and how CTS competed with Amazon.

63. By directing CTS not to sell or stock through Amazon FBA, JPW further sought to suppress CTS's competition with Amazon.

64. CTS rejected the new terms proposed in the March 11, 2024 email.

65. Shortly after CTS rejected the anticompetitive policies outlined in the March 11, 2024 email, JPW refused—and continues to refuse—to fulfill CTS's orders for JPW's Products, which has caused CTS to suffer over $1,000,000.00 in damages.

66. JPW has also refused to honor its other contractual obligations to CTS, such as reimbursing CTS for certain advertising expenses.

67. Upon information and belief, JPW is compelling other distributors to enter into similar anticompetitive agreements when demanded by Amazon.

68. By information and belief, JPW has allowed Amazon itself to advertise and sell the Products at prices below that which JPW permits other retailers, such as CTS, to advertise and sell the Products.

69. By information and belief, JPW sells Products of like grade and quality to Amazon at lower prices and with better terms than offered to CTS.

70. In May 2024, Brett Kenzler spoke with Matt King at a Sphere 1 conference. During the conversation, Brett Kenzler admitted that JPW sought to limit CTS's online sales because JPW was getting pressure from Amazon to restrain a competitor.

71. Brett Kenzler further acknowledged that CTS had been doing a great job increasing the sales volume of the Products and that it was unfortunate that Amazon pressured JPW to eliminate CTS's ability to effectively compete in the market for woodworking and metalworking tools within the United States.

## COUNT I
## BREACH OF CONTRACT

72. CTS realleges the allegations contained in paragraphs 1 through 71 above as if fully stated herein.

73. This is an action for damages for breach of contract.

74. By virtue of JPW's offer of "Preferred Vendor" status to CTS in connection with the Contract and CTS's acceptance, confirmation of terms, and performance thereunder, a contractual relationship was established.

75. In breach of the Contract, JPW, *inter alia*, terminated without basis the parties' business relationship, refused to accept new sales generated by CTS, charged new fees and imposed additional costs on CTS not contemplated by the Contract, and otherwise refused to perform JPW's obligations under the Contract.

76. As a direct and proximate result of JPW's breach of contract, CTS has been damaged in

an amount not less than $1,000,000.00, plus statutory interest, together with its costs and expenses in connection with this action.

**WHEREFORE**, Plaintiff, CTS, demands judgment against Defendant, JPW, for CTS's damages in an amount not less than $1,000,000.00, plus statutory interest, together with its costs and expenses in connection with this action, and such other and further relief as the Court deems just and proper.

<u>**COUNT II**</u>
<u>**VIOLATION OF THE SHERMAN ACT**</u>

77. CTS realleges the allegations contained in paragraphs 1 through 71 above as if fully stated herein.

78. This is an action for injunctive relief and damages pursuant to the Sherman Act, 15 U.S.C. § 1.

79. CTS is entitled to bring this action pursuant to 15 U.S.C. § 15.

80. As alleged above, JPW and CTS entered into the Contract, pursuant to which CTS became a Preferred Vendor of the Products.

81. CTS dramatically increased the sales volume of the Products.

82. JPW conspired with Amazon to remove CTS as a Preferred Vendor and to impose additional costs on CTS.

83. By denying CTS its volume discounts as a Preferred Vendor, JPW would eliminate the downward pressure on its retail margins caused by CTS's aggressive resale pricing.

84. By conspiring with Amazon to prohibit "Price in Cart" discounts, JPW imposed a resale price maintenance agreement, which eliminates CTS's freedom to sell the Products for less than the MAP.

85. The resale price maintenance agreement harms consumers by causing higher prices and diminishing competition in the marketplace. Without competition from CTS, JPW is free to artificially increase its prices for the Products.

86. The resale price maintenance agreement directly harms CTS by limiting CTS's ability to freely transact business and competitively price the Products in the United States.

87. Resale price maintenance is a rule of reason violation of the Sherman act.

88. The relevant market is the market in the United States for woodworking and metalworking tools.

89. Both Amazon and JPW possess the ability to affect prices in the relevant market.

90. JPW's resale price maintenance has adversely affected interbrand competition for woodworking and metalworking tools. By artificially increasing the prices for its own Products, JPW incentivizes competing woodworking and metalworking tool brands to also increase their prices.

91. CTS has suffered monetary losses, as well as sustained irreparable harm to its reputation and goodwill, as a direct and proximate result of these Sherman Act violations.

92. CTS's damages continue to accrue because Defendant's unreasonable vertical restraints on CTS's trade remain ongoing.

93. CTS retained the undersigned counsel to represent it in this litigation and agreed to pay a reasonable fee in exchange for legal services rendered. Pursuant to 15 U.S.C. § 15, as the prevailing party in this action, CTS is entitled to recover its reasonable attorneys' fees and costs from JPW.

**WHEREFORE**, Plaintiff, CTS, requests entry of a judgment against Defendant, JPW for: (i) compensatory damages; (ii) treble damages, pursuant to 15 U.S.C. § 15(a); (iii) temporary injunctive relief to enjoin JPW from resale price maintenance; (iv) permanent injunctive relief to enjoin JPW from resale price maintenance; (v) reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 15(a); (vi) statutory interest; and (vii) such other and further relief as the Court deems just and proper.

**COUNT III**
**VIOLATION OF THE ROBINSON-PATMAN ACT**

94. CTS realleges the allegations contained in paragraphs 1 through 71 above as if fully stated herein.

95. This is an action for injunctive relief and damages pursuant to the Robinson-Patman Act, 15 U.S.C. § 15.

96. CTS is entitled to bring this action pursuant to 15 U.S.C. § 15.

97. JPW unlawfully discriminates in the pricing of the Products between different purchasers, such as CTS and Amazon.

98. JPW engages in interstate commerce when it sells the Products to Amazon and CTS.

99. CTS and Amazon purchase Products of like grade and quality from JPW.

100. Despite this, JPW allows Amazon to advertise and sell the Products at prices below that which JPW permits other retailers, such as CTS, to advertise and sell the Products.

101. This price discrimination impedes free and fair competition in the relevant market to the detriment of CTS and to the benefit of Amazon.

102. CTS has suffered and continues to suffer actual damages as a direct and proximate result of JPW's discriminatory pricing of the Products, including without limitation monetary losses.

103. No legal justification exists for JPW's discriminatory pricing.

104. CTS retained the undersigned counsel to represent it in this litigation and agreed to pay a reasonable fee in exchange for legal services rendered. Pursuant to 15 U.S.C. § 15, as the prevailing party in this action, CTS is entitled to recover its reasonable attorneys' fees and costs from JPW.

**WHEREFORE**, Plaintiff, CTS, requests entry of a judgment against Defendant, JPW, for: (i) compensatory damages; (ii) treble damages, pursuant to 15 U.S.C. § 15(a); (iii) temporary injunctive relief to enjoin JPW from resale price maintenance; (iv) permanent injunctive relief to enjoin JPW from resale price maintenance; (v) attorneys' fees and costs, pursuant to 15 U.S.C. § 15(a); (vi) statutory

interest; and (vii) such other and further relief as the Court deems just and proper.

## COUNT IV
## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT

105. CTS realleges the allegations contained in paragraphs 1 through 71 above as if fully stated herein.

106. This is an action for injunctive relief and damages pursuant to the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201-501.213.

107. JPW has engaged in unfair methods of competition, unconscionable practices, and deceptive acts by violating the Sherman Act and the Robinson-Patman Act.

108. JPW has further engaged in unfair methods of competition, unconscionable practice, and deceptive acts by refusing to allow CTS to purchase the Products for resale to customers notwithstanding the parties' course of dealing and the terms of the Contract.

109. CTS has suffered and continues to suffer damages as a direct and proximate result of JPW's unfair and deceptive trade practices, including without limitation over $1,000,000.00 in lost profits and other damages.

110. CTS retained the undersigned counsel to represent it in this litigation and agreed to pay a reasonable fee in exchange for legal services rendered. Pursuant to Florida Statutes § 501.2105, as the prevailing party in this action, such costs incurred by CTS are payable by JPW.

**WHEREFORE**, Plaintiff, CTS, requests entry of a judgment against Defendant, JPW, for: (i) compensatory damage; (ii) consequential damages, including lost profits; (iii) temporary injunctive relief, pursuant to Florida Statutes § 501.211(1), to enjoin JPW from resale price maintenance; (iv) permanent injunctive relief, pursuant to Florida Statutes § 501.211(1), to enjoin JPW from resale price maintenance; (v) attorneys' fees and costs under Florida Statutes § 501.2105; (vi) statutory interest; and (vii) any such other and further relief as the Court deems just and proper.

## COUNT V
## VIOLATION OF THE FLORIDA ANTITRUST ACT

111. CTS realleges the allegations contained in paragraphs 1 through 71 above as if fully stated herein.

112. This is an action for injunctive relief and damages pursuant to the Florida Antitrust Act, Florida Statutes § 542.18.

113. As alleged above, JPWs conduct, including its attempt to impose resale price maintenance on CTS, constitutes a per see violation of the Florida Antitrust Act, Florida Statutes § 542.18.

114. As alleged above, JPWs conduct, including its attempt to impose resale price maintenance on CTS, constitutes a rule of reason violation of the Florida Antitrust Act, Florida Statutes § 542.18.

115. As a direct and proximate result of JPW's breach of contract, CTS has been damaged in an amount not less than $1,000,000.00, plus statutory interest, together with its costs and expenses in

116. CTS's damages continue to accrue because JPW's unreasonable vertical restraints on CTS's trade remain ongoing.

117. CTS retained the undersigned counsel to represent it in this litigation and agreed to pay a reasonable fee in exchange for legal services rendered. Pursuant to Florida Statutes § 542.22, as the prevailing party in this action, such costs incurred by CTS are payable by JPW.

**WHEREFORE**, Plaintiff, CTS, requests entry of a judgment against Defendant, JPW, for: (i) compensatory damages; (ii) treble damages, pursuant to Florida Statutes § 542.22; (iii) temporary injunctive relief under Florida Statutes § 542.23 to enjoin JPW from resale price maintenance; (iv) permanent injunctive relief under Florida Statutes § 542.23 to enjoin JPW from resale price maintenance; (v) attorneys' fees and costs, pursuant to Florida Statutes § 542.22; (vi) statutory interest; and (vii) such other and further relief as the Court deems just and proper.

**DATED** this 9th day of July, 2024.

/s/ *Michael C. Kelley*
Michael C. Kelley, Esq. (FBN: 99492)
Adam Brandon, Esq. (FBN: 99316)
Caitlin N. Emling, Esq. (FBN: 1026551)
**LAWSON HUCK GONZALEZ, PLLC**
4705 South Apopka Vineland Rd., Suite 210
Orlando, FL 32819
Phone: (407) 710-9950
michael@lawsonhuckgonzalez.com
adam@lawsonhuckgonzalez.com
caitlin@lawsonhuckgonzalez.com
kim@lawsonhuckgonzalez.com
*Counsel for Plaintiff*