## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

CONTRACTOR TOOL SUPPLY, INC.
a/k/a Vera Tools,

      Plaintiff,

v.                           Case No. 5:24-CV-00347-JA-PRL

JPW INDUSTRIES, INC.,

      Defendant.               /

## DEFENDANT'S MOTION TO DISMISS THIRD
## AMENDED COMPLAINT AND MEMORANDUM OF LAW

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant JPW Industries, Inc. ("JPW") moves the Court to dismiss the Third Amended Complaint ("TAC"), ECF No. 35, filed by Plaintiff Contractor Tool Supply, Inc. ("CTS") in its entirety with prejudice.[1]

## I.      INTRODUCTION

JPW opted to stop doing business with CTS, a former distributor of JPW's tools—which either party was free to do—after CTS refused to comply with JPW's minimum advertised price ("MAP") policy (the "MAP Policy"). Disappointed with these circumstances, CTS alleges that JPW breached its purported contract with CTS

---

[1] CTS filed its first amended complaint on January 27, 2025. *See* ECF No. 33. Shortly after, JPW's counsel notified CTS's counsel regarding an apparent technical issue with CTS's amended complaint filed at ECF No. 33. That same evening, to remedy technical issues, CTS filed a second amended complaint, ECF No. 34, and a third amended complaint, ECF No. 35. The third amended complaint, ECF No. 35, referred to in this motion for brevity as the "TAC," is the operative complaint. Although technically the TAC is the third amended complaint filed by CTS in this case, CTS has only substantively amended its complaint in this case once.

and engaged in violations of federal and state antitrust statutes. JPW moved to dismiss CTS's Original Complaint, which the Court granted on December 4, 2024. *See* Order, ECF No. 28, *available at Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, No. 5:24-CV-347-JA-PRL, 2024 WL 4980597 (M.D. Fla. Dec. 4, 2024). The few factual allegations added to the TAC fall far short of remedying the deficiencies in CTS's claims. Dismissal of the TAC is therefore warranted for the same reasons as the Original Complaint.

First, CTS's breach of contract claim (Count I) fails because CTS has not established a contract between CTS and JPW.[2] The purported contract is the "Preferred Vendor Agreement & Program" document attached as Exhibit A to the TAC—a document to which CTS is not a party. That document is not an enforceable contract because it fails to specify the essential term of quantity, lacks consideration, and violates the statute of frauds.

Second, CTS's claim that JPW violated the Sherman Act, 15 U.S.C. § 1 (Count II), fails because CTS does not plausibly allege a resale price maintenance agreement or harm to competition. CTS's purported price resale maintenance agreement is JPW's MAP Policy. But, as this Court found in reviewing the Original Complaint, the MAP Policy restricts *advertised* prices, not *resale* prices. Moreover, even if the MAP Policy was a resale price maintenance agreement, CTS's claim would still fail because the TAC does not plausibly allege any harm to *consumers* in the market caused by the MAP

---

[2] Following JPW's motion to dismiss the Original Complaint, CTS voluntarily dismissed its breach of contract claim without prejudice, so the Court's Order did not rule on that count. *See* ECF No. 22.

Policy. CTS only vaguely alleges harm to itself; it does not plausibly allege that consumers in the nationwide woodworking tool market have been injured by increased prices or reduced output—because they have not. In fact, the only prices at which Amazon allegedly advertised JPW tools mentioned in the TAC are ones CTS alleges were below-MAP prices reflecting a reduction in cost to consumers. Under U.S. Supreme Court and Eleventh Circuit Court of Appeals precedent, such allegations are insufficient as a matter of law. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890–92, 895, 898 (2007); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339–40 (11th Cir. 2010).

Third, CTS's claims that JPW violated sections 2(a) and 2(d) of the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13 (Count III) and  15 U.S.C. § 15 (Count IV), fail because the TAC does not plausibly allege that any pricing or advertising programs (that JPW allegedly provided to Amazon but not to CTS) caused a cognizable antitrust injury to CTS. As alleged in the TAC, by the time JPW allegedly began giving these discriminatory advantages to Amazon, CTS was no longer purchasing tools from JPW because JPW had terminated CTS as one of its distributors. CTS is therefore unable to allege any injury that is causally linked to JPW's alleged discriminatory advantages provided to Amazon. The section 2(a) claim is deficient for the additional reason that the TAC fails to refute the logical inference that any pricing advantage JPW allegedly provided to Amazon was a legitimate functional discount rather than evidence of an illegal pricing discrimination scheme. Similarly, the section 2(d) claim is deficient for the additional reason that the TAC merely recites the elements of a section 2(d) claim,

without any factual support, and therefore runs afoul of *Iqbal* and *Twombly*.

Finally, CTS's claims for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201–501.213, Fla. Stat. (Count V), and the Florida Antitrust Act ("FAA"), § 542.18, Fla. Stat. (Count VI), are identical to CTS's Sherman Act and RPA claims. Consequently, these claims should be dismissed for the same reasons the Sherman Act and RPA claims should be dismissed.

For these reasons, as shown below, the TAC fails to plausibly allege the elements of its claims and should be dismissed in its entirety with prejudice.[3]

## II.    SUMMARY OF ALLEGATIONS IN THE TAC

As alleged in the TAC, JPW manufactures woodworking tools, and CTS distributes woodworking tools through its brick-and-mortar store, its website, and on Amazon. *See* TAC ¶¶ 11, 13, 23, 24, 26, 29. CTS alleges that "[o]n or about November 2021, JPW offered . . . to sell its Products to CTS in accordance with the terms of the Sphere 1 Preferred Vendor Agreement & Program (the "Sphere 1 Program"), and "[t]hrough the parties' course of dealing and performance . . . a contractual relationship was established." TAC ¶¶ 42, 102–05.

JPW has a MAP Policy which sets the minimum price at which distributors, such as CTS, can advertise JPW tools to retail customers. *See id.* ¶¶ 36, 70; *see also* MAP Policy, attached hereto as **Exhibit 1**.[4] The purpose of the MAP Policy is "[t]o

---

[3] As shown in this motion, despite receiving an opportunity to amend and guidance from the Court regarding the factual allegations necessary for CTS to plausibly allege its claims, CTS has been unable to amend its pleading to state a proper claim. The TAC should therefore be dismissed with prejudice.
[4] Although the MAP Policy is not attached to the TAC, it is incorporated into the TAC by reference

protect the reputation and value of [JPW-branded tools]" by "promot[ing] advertising practices aimed at delivering consistent message to consumers about the superior quality of JPW Industries Products." Ex. 1 at 2. The MAP Policy—which by its terms applies to all authorized resellers of JPW tools—specifically states that it "only applies to advertised prices" and resellers are "free to sell the[] products at any prices they select." *Id*. The MAP Policy explains that, while certain language directing online customers to see the price in the shopping cart is a violation of the MAP Policy, resellers are not prohibited from communicating below-MAP prices to customers viewing JPW tools online of through other ways:

> The use of any language on the digital space to direct the consumer to the shopping cart for actual selling price is limited to; "We offer the best prices", "Call for Price", "Call with any questions", "Call for additional questions related to the product". In all these cases the MAP must be displayed on the page. Unacceptable language can be defined as "Price too low to display" "See Price in Cart", "Add to Shopping Cart to See Price", etc., and are all violations of the MAP Policy.

*Id.* at 3.

On March 11, 2024, JPW informed CTS that it would be a violation of JPW's MAP Policy for CTS to post advertised prices for JPW's tools below JPW's designated MAP prices on CTS's website or in an Amazon "shopping cart" using a "Price in Cart" communication to customers. *See* TAC ¶ 81, Ex. C. CTS alleges it "rejected the

---

see, e.g., TAC ¶¶ 70, 83, 115, and can be considered by the Court in addressing this motion, *see Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). In addition, the MAP Policy is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson*, 107 F.4th at 1300. Indeed, the MAP Policy is the purported resale price maintenance agreement that forms the basis for CTS's Sherman Act claim and state-law claims. *E.g.*, TAC ¶ 115.

new terms proposed in the March 11, 2024 email," and, "[s]hortly after . . . JPW refused—and continues to refuse—to fulfill CTS's orders[.]" *Id.* ¶ 90–91.

CTS alleges the terms JPW sent in its March 11, 2024 email were due to pressure Amazon put on JPW because Amazon had become "[a]larmed by the emergence of [CTS] as a competitor" in reselling JPW tools on Amazon's website. *See id.* ¶¶ 57–58. CTS alleges "[b]y information and belief" that representatives of Amazon and JPW met "on or about February 2024," and "Amazon demanded [from JPW] (and received)": (i) "priority shipping," (ii) "preferential inventory allocation," (iii) fees "charged back [to] JPW for the loss of business due to competition [from CTS]," (iv) a waiver of credit card payment fees, and (v) funding for advertising costs for Amazon to sell JPW's tools on Amazon's website *Id.* ¶¶ 61–68. Amazon also allegedly demanded that JPW retract discounts and pricing it previously offered CTS, remove CTS from the Sphere 1 Program, and enforce the MAP Policy against CTS, but not against Amazon. *Id.* ¶¶ 66, 69–70.

As shown below, these allegations fail to state a claim.

## III.    ARGUMENT AND CITATION TO AUTHORITIES

### A.    <u>Legal Standard</u>

A complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), where it does not plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555, 570 (2007). While generally well-pled allegations contained in the complaint are accepted as true, that "tenet . . . is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted). Thus, to survive a motion to dismiss, a complaint must contain "more than labels and conclusions." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

**B.    CTS's Breach of Contract Claim (Count I) Should Be Dismissed.**

As shown below, CTS's breach of contract claim fails as a matter of law because the purported "contract": (a) does not specify the essential term of quantity; (b) lacks consideration; and (c) violates the statute of frauds.[5]

**1.    The Purported "Contract" Fails Because It Does Not Specify the Essential Term of Quantity.**

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish . . . the existence of a contract," which requires pleading, among other things, "sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1272 (11th Cir. 2009). Quantity is an essential term for a contract for sale of goods. *E.g., Wacker Chem. Corp. v. Nebula Glass Int'l, Inc.,* No. 10-62130, 2011 WL 13217163, at *5 (S.D. Fla. Dec. 7, 2011); *Office Pavilion S. Fla., Inc. v. ASAL Prods., Inc.,* 849 So. 2d 367, 371 (Fla. 4th DCA 2003); § 672.201(1), Fla. Stat. ("[T]he contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.").

The purported "contract" that CTS alleges exists between JPW and CTS (the

---

[5] The 2024 JPW-Sphere 1 agreement attached as Exhibit B to the TAC expressly excludes CTS (at Section 4) and, therefore, cannot form the basis of any breach of contract claim. While JPW addresses this claim in connection with Exhibit A to the TAC, such arguments also bar a claim premised on Exhibit B.

JPW-Sphere 1 agreement, attached to the TAC as Exhibit A, *to which CTS is not a party*) does not contain a quantity (nor does it provide that it is a requirements contract). Because the purported agreement does not specify this essential term, CTS has not plausibly alleged the existence of a contract between CTS and JPW to support its breach of contract claim. *See Vega,* 564 F.3d at 1272. That claim therefore fails.

### 2. The Purported "Contract" Fails for Lack of Consideration.

"In a contract where the parties exchange promises of performance, '[i]f either of those promises is illusory or unenforceable then there is no consideration for the other promise.'" *Off. Pavilion*, 849 So. 2d at 370 (quoting *Allington Towers N., Inc. v. Rubin*, 400 So. 2d 86, 87 (4th DCA 1981)). In other words, "[a] promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice or alternative performances." *Id.* (quoting Restatement (Second) of Contracts § 77).

Here, CTS has alleged no facts that it provided any consideration for its purported contract with JPW. It alleges only that JPW agreed to sell products to CTS at an unspecified discount, which CTS "accepted." But under the purported "contract," CTS was not obligated to do anything—it could choose to order from JPW products pursuant to the terms of Exhibit A *or not at all*. CTS's failure to allege that it provided any consideration under this deal renders the purported contract illusory and unenforceable. *See, e.g.*, *Off. Pavilion*, 849 So. 2d at 370–71 (holding that purported modification to contract between wholesaler and distributor "was illusory and unenforceable" because wholesaler's acceptance of purported agreement "involved no

promised performance and therefore did not constitute consideration to support the contract" for chairs—*i.e.*, it allowed the wholesaler the option to purchase chairs or not at all); *cf. Rekal Co. v. PGT Indus., Inc.*, No. 8:13-CV-1433-T-33TGW, 2013 WL 5487370, at *3-4 (M.D. Fla. Sept. 30, 2013) ("At no point do the Terms and Conditions specify any obligation on the part of either party sufficient to create an enforceable contract—not a minimum number of units to be ordered, a minimum duration of exclusivity, nor a fixed price at which goods can be purchased.").

The breach of contract claim therefore fails for this reason too.

### 3.    The Purported "Contract" Violates the Statute of Frauds.

For a "contract for the sale of goods for the price of $500 or more" to be enforceable, the Florida statute of frauds requires "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." § 672.201(1), Fla Stat.

The statute of frauds applies here because CTS alleges that JPW would not fulfill orders for "sales for $2 million of JPW's Products." TAC ¶¶ 54, 91, 106. The breach of contract claim violates the statute of frauds because, for the purported "sales for $2 million of JPW's Products," CTS: (a) has not alleged a signed writing by JPW and (b) has not alleged "that a contract for sale has been made between the parties."[6] *See* § 672.201(1), Fla Stat. Instead, CTS relies upon Exhibit A to the TAC, which is neither a signed writing by JPW nor a "contract for sale" between CTS and JPW that

---

[6] As stated, Exhibit B expressly excludes CTS and, therefore, cannot form the basis of a contract claim.

satisfies the statute of frauds.[7]

For these reasons, CTS's breach of contract claim fails as a matter of law.

## C.    CTS's Sherman Act Claim (Count II) Should Be Dismissed.

CTS's Sherman Act claim alleged in the TAC should be dismissed for the same two reasons the Court dismissed that claim alleged in the Original Complaint: (i) the MAP Policy is not a resale price maintenance agreement because it restricts *advertised* prices, not *resale* prices and (ii) the TAC fails to plausibly allege the MAP Policy causes any actual or potential harm to consumers in the market.

### 1.    CTS Fails to Plausibly Allege Conduct Fixing Resale Prices.

Because JPW's MAP Policy only restricts the minimum price at which distributors can advertise products for sale, and does not restrict the price at which distributors actually sell the products, *see* Ex. 1 at 3, it "does not violate Section 1 of the Sherman Act, nor does it constitute proof of a vertical agreement to fix prices,*"* *Campbell v. Austin Air Sys., Ltd.*, 423 F. Supp. 2d 61, 68 n.6 (W.D.N.Y. 2005); *see also Blind Doctor Inc. v. Hunter Douglas, Inc.*, No. C-04-2678 MHP, 2004 WL 1976562, at *7 (N.D. Cal. Sept. 7, 2004) (dismissing a Sherman Act claim based on a manufacturer's advertising policy); *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, No. 10 CIV. 7781 NRB, 2011 WL 4352390, at *5 (S.D.N.Y. Sept. 15, 2011) (finding a MAP policy that

---

[7] No exception applies to somehow save CTS's attempted claim. Sphere 1 is not, nor is it alleged to be, a merchant. Even if it were, there is no allegation that a written confirmation of the "contract" was sent to JPW, let alone within a reasonable time of JPW and Sphere 1 purportedly entering the "contract" "[o]n or about November 2021." TAC ¶ 42. No such allegation could be made because the purported breach arises from purchase orders that CTS sent years later—in March 2024—that CTS alleges JPW promptly refused to accept. *Id.* at ¶ 91.

restricts advertised prices for products online, but does not restrict distributors from communicating actual sale prices below the MAP to customers over the phone, by email, or in a purchase confirmation communication "does not restrain resale prices, but merely restricts advertising").[8] Based on the same MAP Policy, the Court held that CTS's Original Complaint "[did] not plausibly allege[] the existence of a vertical resale price maintenance scheme." Order, ECF No. 28 at 7.

Like the Original Complaint, the TAC alleges JPW's MAP Policy essentially sets the resale price for JPW's tools advertised online because it restricts CTS from using an Amazon shopping cart as the vehicle to display the below-MAP prices at which CTS seeks to sell JPW's tools (to which the customer is prompted to visit with a "Price in Cart" message). *See* TAC ¶¶ 37–41, 115. CTS only added one allegation to the TAC to support its contention that JPW's MAP Policy constitutes a resale price maintenance agreement: "Amazon does not provide customers with phone numbers for competing retailers or facilitate the ability of customers to directly call competing retailers." TAC ¶ 41. This does not remedy the deficiency in CTS's claim. CTS still does not allege, as it cannot, that JPW's MAP Policy blocks CTS from all ways of communicating below-MAP prices to customers on Amazon—much less to customers CTS sells to through its own store and website. *See id.* Nothing in the TAC changes the fact that JPW's MAP Policy only restricts *advertising*, such as certain restrictions

---

[8] *See also WorldHomeCenter.com, Inc. v. Franke Consumer Products, Inc.*, No. 10 CIV. 3205, 2011 WL 2565284, at *5 (S.D.N.Y. June 22, 2011) ("[T]he Policy does not actually constitute a vertical price restraint . . . [because it] plainly discuss advertised prices, not resale prices . . . [and] provides internet retailers with more than one way to communicate lower prices to clients.").

on how CTS can alert consumers to the availability of prices for JPW tools, which JPW has adopted to help protect its brand. *See* Ex. 1 at 2–3. CTS retains complete discretion in setting sale prices. *See id.* Accordingly, like the Original Complaint, the TAC "[does] not plausibly alleged the existence of a vertical resale price maintenance scheme," and CTS's Sherman Act claim should be dismissed. *See* Order, ECF No. 28 at 7.

### 2. CTS Fails to Plausibly Allege Harm to Competition.

Even if CTS had adequately alleged the existence of a vertical resale price maintenance agreement, the TAC "still comes up short under the rule of reason." *See* Order, ECF No. 28, at 8. "To state a claim under the rule of reason, an antitrust plaintiff must plead '(l) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.'" *Id.* (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996). This requires the plaintiff to define the particular market and "adequately allege actual or potential harm to competition." *See id.* (citing *Levine*, 72 F.3d at 1339). Here, although the TAC adds a few conclusory allegations regarding JPW's alleged share of sales in the woodworking tool market, it is still deficient for the same reasons as the Original Complaint. Specifically, CTS still fails to plausibly allege any actual or potential injury to competition within the woodworking tool market (i.e., *inter*brand competition) rather than merely alleging injury to a single competitor, CTS (i.e., *intra*brand competition).

As this Court explained in its Order dismissing CTS's Sherman Act claim

asserted in the Original Complaint:

> Actual harm is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market . . . ." *Jacobs*, 626 F.3d at 1339. To state a claim, an antitrust plaintiff must make "specific factual allegations" of the "[a]ctual anticompetitive effects" of the defendant's conduct. *Id.* (quoting [*Spanish Broad. Sys. Of Fla. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1073 (11th Cir. 2004)]). "By 'anticompetitive,' the law means that a given practice both harms allocative efficiency and could 'raise[] the prices of goods above competitive levels or diminish[] their quality . . . . *Id.* (alterations in original) (emphasis removed) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)). "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Id.* (citing *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)). However, "the primary purpose of the antitrust laws is to protect *inter*brand competition," or competition among manufacturers selling different brands of the same type of product. *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (emphasis added). Indeed, it is well-established that *inter*brand competition may be stimulated by reducing the *intra*brand competition that takes place "among retailers of the same brand." *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 878. Thus, in general, "reduction in intrabrand competition is not an anticompetitive effect under the Sherman Act." *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1290 (S.D. Fla. 2021) (citing *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 890).

Order, ECF No. 28 at 8–9.

In reviewing the allegations in the Original Complaint, the Court found that CTS's "'bald statement[s]' that 'JPW's resale price maintenance has adversely affected interbrand competition' through 'higher prices and diminish[ed] competition in the marketplace,' (Compl. ¶¶ 85, 90), are inadequate to 'establish[] the competitive level above which [JPW]'s allegedly anticompetitive conduct artificially raised prices.'" *Id.* at 9 (citing *Jacobs*, 626 F.3d at 1339). Here, despite this guidance from the Court, the TAC merely asserts the exact same bald statements that "JPW's resale price

maintenance has adversely affected interbrand competition" through "diminishe[d] competition in the marketplace" and "higher prices." TAC ¶¶ 116, 122. There are no facts alleged in the TAC to support this conclusory allegation. In fact, the only prices of JPW tools mentioned in the TAC are ones CTS alleges Amazon advertised at *below*-MAP prices reflecting a *reduction* in cost to consumers. *See id.* ¶¶ 71, 73. Thus, as the Court previously found, the TAC's "'sparse allegation' that the elimination of 'Price in Cart' discounts will generate anticompetitive effects 'is precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*.'" Order, ECF No. 28 at 10 (citing *Jacobs,* 626 F.3d at 1340). Instead of adequately alleging harm to competition, the TAC alleges "harm only to intrabrand competition, which does not amount to actual harm under the rule of reason." *Id.* (citing *Leegin Creative Leather Prods., Inc.,* 551 U.S. at 902).

Because it has "[f]ail[ed] to plausibly plead actual harm to competition, CTS's 'only avenue of relief [is] to sufficiently allege potential harm.'" *Id.* (citing *Jacobs*, 626 F.3d at 1339). "To do so, CTS must (1) 'define the relevant market and establish that the defendants possessed power in that market' and (2) make 'specific allegations linking market power to harm to competition in that market.'" *Id*. (quoting *Jacobs*, 626 F.3d at 1339; *see also Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983) (defining "market power" as means "the ability to raise price significantly above the competitive level without losing all of [its] business"). The TAC "is also deficient on both of these requirements." Order, ECF No. 28 at 10.

First, in order to "demonstrate market power circumstantially," CTS "must: (1)

define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434 (citations omitted). Although the TAC implausibly and remarkably alleges that "JPW controls over 50% of the woodworking tool market in the United States," TAC ¶ 17,[9] there are no factual allegations showing either the existence of "significant barriers to entry" into the woodworking tool market or "that existing competitors lack the capacity to increase their output in the short run," in response to JPW's alleged increased prices. *See Rebel Oil*, 51 F.3d at 1434. Consequently, the TAC continues to inadequately allege that JPW has market power such that it can "raise price significantly above the competitive level without losing all of [its] business." *See Graphic Prods. Distribs.*, 717 F.2d at 1570; *see also Jacobs,* 626 F.3d at 1340.

Second, the TAC "is bereft of the critical allegations linking [JPW]'s market power to harm to competition." *See Graphic Prods. Distribs.*, 717 F.2d at 1570. Indeed, like the Original Complaint, the TAC "does not plausibly allege that competitors have reacted to the allegedly higher prices of JPW's tools, nor does the [TAC] specifically

---

[9] CTS alleges that its purchases of just JPW-branded woodworking tools—which ranged from $1.9 million in 2022 to $6.3 million in 2023—constituted the third largest source of sales for JPW. *See* TAC ¶¶ 47, 48, 51. Those figures appear overstated as CTS alleged in the Original Complaint that its purchases of JPW tools in the amounts of $1.9 million in 2022 and $6.3 million in 2023 reflected CTS's purchases of *both* woodworking *and* metalworking tools from JPW in those years. *See* Compl., ECF No. 2 ¶¶ 36–37. Regardless, if a few million dollars in annual sales represents such a significant portion of JPW's total business in the woodworking tool market, it seems highly implausible that JPW could "control[] over 50% of the woodworking tool market in the United States." TAC ¶ 17; *see also Jacobs*, 626 F.3d at 1333 (determining the plausibility of allegations in a complaint is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" (quoting *Iqbal*, 556 U.S. at 679)).

allege marketwide increases in price or reduced output." Order, ECF No. 28 at 12. "In the absence of these types of factual allegations linking JPW's market power to harm to competition in the market, CTS fails to state a claim." *See id.*

Finally, CTS fails to sufficiently plead competitive harm for the additional reason that the TAC contains no factual allegations showing that "[JPW's] conduct has no pro-competitive benefit or justification," as required by the rule of reason analysis. *See Spanish Broad. Sys.*, 376 F.3d at 1071. Nor could CTS so allege as the MAP Policy expressly states its pro-competitive benefit and justification:

> JPW Industries has built a strong reputation and following among consumers and users for its . . . brands. In order for . . . [JPW] branded products to compete successfully against other brands, it is necessary that resellers provide potential customers with explanation and demonstration of features and benefits to assist with selection of the product and provide after-sale service and support. These activities require that resellers be able to realize adequate profits on the sale of . . . [JPW] branded products and thereby encourage the long term success of the resellers and . . . To protect the reputation and value of . . . [JPW] brands, JPW Industries has established a Minimum Advertised Price Policy (MAPP) for . . . [its] branded products. This policy will promote advertising practices aimed at delivering a consistent message to consumers about the superior quality of JPW Industries Products.

Ex. 1, MAP Policy at 2; *see c.f. Leegin Creative Leather Prods., Inc.*, 551 U.S. at 889–92 (summarizing the various pro-competitive effects vertical restraints may have, including ones similar to the pro-competitive benefits outlined in JPW's MAP Policy).

Accordingly, under controlling Supreme Court and Eleventh Circuit law, CTS has failed to sufficiently allege either actual or potential harm to competition in the woodworking tool market, and its Sherman Act claim should therefore be dismissed.

**D.    CTS's RPA Claims Should Be Dismissed.**

    **1.    CTS's RPA Claims (Counts III and IV) Should Be Dismissed Because the TAC Fails to Allege a Cognizable Antitrust Injury.**

CTS does not allege an injury caused by alleged discrimination by JPW in pricing or promotional programs. Instead, the only injury the TAC alleges is due to JPW ending its business relationship with CTS after CTS refused to follow JPW's MAP policy and other terms reflected in the March 11, 2024 email. Therefore, CTS's claims for price discrimination under section 2(a) of the RPA (Count III)[10] and promotional program discrimination under section 2(d) of the RPA (Count IV) fail to plausibly allege an antitrust injury causally connected to any alleged pricing or promotional program discrimination. This dooms both of CTS's RPA claims.

"'Price discrimination is not per se violative of the [Robinson-Patman Act]'[;] the plaintiff must also show 'some sort of real competitive injury.'" Order, ECF No. 28 at 12 (citing *Walker*, 992 F. Supp. at 1338 (citations omitted)). "And the injury must be 'causally connected to the alleged antitrust violation.'" *Id.*; *see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62 (1981) (holding a private party suing for damages caused by an RPA violation under 15 U.S.C. § 15(a) "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent"); *Pentair Filtration Sols., LLC v. Superior Water Sys. Co. Inc*, No. 12-

---

[10] "[T]o establish a price discrimination claim under the RPA, a plaintiff must show: 1) that the defendant discriminated in price, discounts, or services between purchasers of commodities of like grade and quality in the course of interstate commerce; 2) that the price discrimination resulted in the requisite injury to competition or competitors; and 3) at least the approximate amount of damages." *Walker v. Hallmark Cards, Inc.*, 992 F. Supp. 1335, 1338 (M.D. Fla. 1997) (citation omitted).

62163-CIV, 2013 WL 12091626, at *3 (S.D. Fla. Nov. 14, 2013) ("With respect to damages, '[p]rice difference without more does not indicate the amount of lost sales or profits.'" (citation omitted)). Thus, to state an antitrust injury supporting its RPA claims, CTS must make factual allegations showing that it lost sales or profits as a result of "a competitive advantage bestowed upon [Amazon] through its receipt of discriminatory prices." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1426–27 (11th Cir. 1990). This may be pled by factual allegations either identifying specific sales CTS lost to Amazon as a result of favorable pricing and advertising funds or demonstrating that Amazon received "a significant price reduction [from JPW] over a substantial period of time." *See Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006).

Here, the TAC does not identify any particular sale CTS lost to Amazon. Rather, CTS attempts to plead competitive injury by alleging JPW's "price discrimination" and "discriminatory payment of promotional allowances" "substantially lessen[ed] competition in the sale of the Products over a substantial period of time[.]" TAC ¶¶ 138, 155. There are no factual allegations supporting this legal conclusion; to the contrary, this conclusion is refuted by the TAC's allegations.

Specifically, CTS alleges that Amazon demanded the alleged pricing advantages and advertising funds from JPW during its February 2024 meeting with Amazon. *See* TAC ¶ 61. As such, Amazon began receiving those alleged discriminatory benefits from JPW no earlier than February 2024 (probably later depending on how often Amazon orders tools from JPW, which is not alleged in the

18

TAC). *See id.* And, based on CTS's allegations that its sales of JPW tools had been "dramatically increasing" through the end of March 2024, CTS could not have begun losing sales to Amazon due to alleged discriminatory benefits Amazon received from JPW until *after* March 2024 *at the earliest. See* TAC ¶ 48 ("In 2023, CTS more than tripled the volume of its business with JPW"); *id.* ¶ 54 ("By the end of March 2024, CTS had already generated $2 million in online sales of JPW's Products and was on track to exceed the sales volume of the prior year."). But as alleged in the TAC, by sometime in March 2024, CTS had stopped purchasing tools from JPW. *See* TAC ¶¶ 90–91 (alleging CTS "rejected the new terms proposed [by JPW] in the March 11, 2024 email," and, "[s]hortly after . . . JPW refused—and continues to refuse—to fulfill CTS's orders").

Thus, the allegations in the TAC indicate that, by the time JPW allegedly began providing Amazon with price advantages and advertising funds, CTS was no longer purchasing tools from JPW. *See* TAC ¶¶ 61, 90–91. Under these allegations, CTS has not even plausibly alleged that it contemporaneously purchased *any* JPW tools at functionally higher prices than the same tools purchased by Amazon due to discounts and advertising funds JPW provided to Amazon but not CTS.[11] *See Iqbal*, 556 U.S. at 678 (holding allegations merely showing that liability is possible rather than plausible

---

[11] The TAC alleges that, on September 19, 2023 and September 26, 2023, Amazon advertised for sale JPW tools at below-MAP prices. TAC ¶¶ 71, 73. To the extent CTS contends these are sales it lost to Amazon to support its RPA claims, that argument fails because both of these advertised prices by Amazon occurred prior to Amazon's alleged meeting with JPW to pressure JPW to give Amazon various discounts and advertising funds. *See id.* ¶¶ 61, 90–91.

is insufficient to state a claim).[12] CTS has therefore clearly failed to plausibly allege that it contemporaneously purchased JPW tools at functionally higher prices than Amazon purchased JPW tools "over a substantial period of time," such that a competitive injury can be inferred without identifying any sales CTS allegedly lost to Amazon. *See Volvo*, 546 U.S. at 177.

At bottom, the injury alleged by CTS was not caused by JPW allegedly providing pricing or advertising benefits to Amazon, but due to JPW ending its business relationship with CTS after CTS refused to follow JPW's MAP policy and other terms reflected in the March 11, 2024 email. Any injury allegedly caused by JPW terminating CTS as a distributor does not support an RPA claim because it is not causally linked to pricing or advertising funds discrimination. *See Campbell*, 423 F. Supp. 2d at 71 ("Campbell's losses resulting from his termination and the effect of his termination on his unnamed competitors is not relevant to [the RPA injury] inquiry"); *see also B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 669 (10th Cir. 2006) ("It is well established that a refusal to deal simply does not fall within the proscription of section 2(a) of the Robinson–Patman Act." (citation and internal quotation marks omitted)). CTS's termination as a distributor for JPW tools likewise precludes CTS's

---

[12] To state a RPA claim for price discrimination, "[t]he complaining party must allege and prove that there were two sales made by the same seller to at least two different purchasers at different prices," *Pierce v. Commercial Warehouse, Div. of Thompson Auto. Warehouse, Inc.*, 876 F.2d 86, 87 (11th Cir. 1989), which occurred "contemporaneously," *see Volvo*, 546 U.S. at 169. Thus, CTS's failure to plausibly allege that CTS and Amazon were contemporaneously purchasing tools from JPW at the time JPW was allegedly providing favorable pricing and advertising programs to Amazon provides an additional basis for dismissal of Count III.

requests for temporary and permanent injunctions enjoining JPW's alleged discriminatory pricing and advertising practices. *See H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1022 (2d Cir. 1989) ("Since Siemens is no longer selling to Hayden or Schein Dental, as is its right, there is no danger that it will sell to them on discriminatory terms in violation of 15 U.S.C. § 13 (1982), and accordingly no basis for a Robinson–Patman injunction." (citation omitted)).

Accordingly, CTS has failed to plausibly allege a cognizable injury caused by alleged discriminatory pricing or promotional programs, and both RPA claims should be dismissed. *See Pentair*, 2013 WL 12091626, at *4 ("There are no facts exhibiting the lost sales and/or lost profits incurred by Counter-Plaintiffs as a result of price discrimination. Indeed, Counter-Plaintiffs have failed to allege any facts as to the identity, frequency of sale, purchase price, or sale price of any relevant product(s) before and after Pentair Residential's purported price discrimination.").

### 2.    CTS's Claim for Violation of Section 2(a) of the RPA (Count III) Also Fails Because CTS Does Not Adequately Allege the Pricing Discounts Received by Amazon Are Not Legitimate Functional Discounts.

The RPA expressly excepts from liability a functional discount a manufacturer provides to a distributor for legitimate reasons, such as a volume discount. *See* 15 U.S.C. § 13(a) ("[N]othing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . ."). For this reason, "the plaintiff bears the burden of pleading and proving that any price differences identified in its complaint do not

21

reflect legitimate functional discounts." *Sw. Paper Co., LLC v. Hansol Paper*, No. CV 12-8721, 2013 WL 11238487, at \*4 (C.D. Cal. Apr. 15, 2013); *see also Bookends & Beginnings LLC v. Amazon.com, Inc.*, No. 21-CV-02584, 2022 WL 18144916, at \*24 (S.D.N.Y. Aug. 24, 2022) ("Plaintiff provides no facts from which to plausibly infer that the discount offered to Amazon was not a commercially reasonable functional discount"), *report and recommendation adopted*, No. 1:21-CV-2584-GHW-VF, 2022 WL 4586213 (S.D.N.Y. Sept. 29, 2022).

Here, CTS alleges that Amazon is a "domina[nt]" retailer of woodworking tools and, in particular, the highest-volume online retailer of JPW tools. *See, e.g.*, TAC ¶¶ 31, 56–57. Thus, the TAC's factual allegations support the logical inference that any pricing discount JPW allegedly provided to Amazon was a legitimate functional discount, such as a volume discount, and fail to state a claim for non-justified price discrimination. *See Bookends*, 2022 WL 18144916, at \*24; *see also Twombly*, 550 U.S. at 557 (holding allegations "merely consistent with [liability] . . . stops short of the line between possibility and plausibility of entitlement to relief" (citation and internal quotation marks omitted)). CTS's price discrimination claim (Count III) should be dismissed for this additional reason. *See Coal. For A Level Playing Field, L.L.C. v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 215–16 (S.D.N.Y. 2010).

### 3.    CTS's Claim for Violation of Section 2(d) of the RPA (Count IV) Also Fails Because the TAC's Conclusory Allegations Regarding the Alleged Advertising Assistance Provided to Amazon Are Insufficient.

The elements of a claim for violation of section 2(d) of the RPA are:

(i) the seller paid or contracted to make some payment or allowance for

> the furnishing of advertising, promotional, or merchandising services in connection with a competitors resale of the sellers products; (ii) the seller failed to offer the payments or allowances on proportionally equal terms to all other customers competing with the favored purchaser in the distribution of the sellers products; and (iii) the plaintiff was injured in its business or property because of the payment or allowance.

*Coal. For A Level Playing Field*, 737 F. Supp. 2d at 213.

Here, the TAC merely recites these elements in conclusory fashion. *See, e.g.*, TAC ¶ 68 ("Amazon demanded (and received) funding from JPW to market and sell JPW's Products at a discount on the Amazon marketplace."); *id.* ¶ 154 ("JPW did not offer to pay for the same or similar promotional allowances for CTS on proportionally equal terms as JPW offered Amazon."). There are no facts alleged supporting these legal conclusions, such as what the alleged promotional program was, what the alleged promotional funds were for, when and for how long the promotion allegedly occurred, or how CTS was allegedly notified or became aware of the program offered to Amazon. Thus, CTS's claim for violation of section 2(d) of the RPA is no more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [which] do not suffice" under *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also Coal. For A Level Playing Field*, 737 F. Supp. 2d at 218 (finding the plaintiffs failed to plausibly allege a discriminatory advertising or promotional program). Count IV therefore fails to state a claim and should be dismissed for this additional reason.

**E.    CTS's FDUTPA Claim (Count V) Should Be Dismissed.**

"When, as here, a plaintiff's FDUTPA claim is based on the same allegations

as its antitrust claim, failure to establish a violation of the antitrust laws is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim." *QSGI, Inc. v. IBM Global Financing*, No. 11–80880, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012).[13] Thus, CTS's FDUTPA claim in Count V should be dismissed for the same reasons its antitrust claims should be dismissed.

## F.    CTS's Florida Antitrust Act Claim (Count VI) Should Be Dismissed.

The FAA's construction provision provides: "It is the intent of the Legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." § 542.32, Fla. Stat. Thus, CTS's FAA claim in Count VI fails for the same reasons its Sherman Act claim fails. *See JES Props.*, 2005 WL 1126665, at *19.[14]

## IV.  CONCLUSION

For the foregoing reasons, the TAC fails to state a claim upon which relief may be granted and should be dismissed in its entirety. Because CTS has not been able to amend its pleading to state a proper claim, the TAC should be dismissed with prejudice.

---

[13] *See also AT&T Mobility LLC v. Phone Card Warehouse*, No. 6:08-cv-1909-Orl-18, 2009 WL 10671270, at*5 (M.D. Fla. June 25, 2009) ("[B]ecause PCW has failed to state a claim under federal and state antitrust laws, it has also failed to properly plead a FDUTPA claim."); *JES Props., Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005), ("[F]or the same reasons this Court has found no violation of the Federal antitrust laws, this Court finds that Plaintiffs have failed to establish the elements of a violation of" FDUTPA."), *aff'd*, 458 F.3d 1224 (11th Cir. 2006).

[14] *See also Andrx Pharm., Inc. v. Elan Corp.*, PLC, 421 F.3d 1227, 1233 (11th Cir. 2005) ("[T]he Florida antitrust statutes . . . closely track the language of the Sherman Act and are analyzed under the same rules and case law. Accordingly, our discussion of federal antitrust law applies with equal force to the Florida statutory provisions." (citation omitted)).

## NOTICE OF INTENT TO SEEK ATTORNEY'S FEES

Defendant hereby gives further notice and reserves its right to seek attorneys' fees and costs on any applicable ground, including section 501.2105(1), Florida Statutes, and section 542.22(1), Florida Statutes, or any other basis.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(g)

JPW's undersigned counsel certifies that counsel for JPW conferred with CTS's counsel via zoom on February 26, 2025 in a good faith effort to resolve this motion, and the parties were unable to resolve the motion.

Respectfully submitted this 27th day of February, 2025.

HOLLAND & KNIGHT LLP

/s/ *Kevin W. Cox*

Kevin W. Cox
Lead Counsel
Florida Bar No. 34020
Email:kevin.cox@hklaw.com
Kathryn Isted
Florida Bar No. 1005163
Email: kathryn.isted@hklaw.com
315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
Telephone: (850) 224-7000
Fax: (850) 224-8832

*Attorneys for Defendant JPW Industries, Inc.*