## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

CONTRACTOR TOOL SUPPLY, INC.,
a/k/a Vera Tools, a Florida for-profit
corporation,

        Plaintiff,

v.

JPW INDUSTRIES, INC., a Washington
for-profit corporation,

        Defendant.

_____/

Case No.:  5:24-cv-00347

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS THIRD
## AMENDED COMPLAINT AND MEMORANDUM OF LAW

Plaintiff, Contractor Tool Supply, Inc. a/k/a Vera Tools ("Plaintiff" or "CTS"),

pursuant to Middle District of Florida Local Rule 3.01, responds to the Motion to

Dismiss Third[1] Amended Complaint and Memorandum of Law dated February 27,

2025 (the "Motion to Dismiss") filed by Defendant, JPW Industries, Inc. ("Defendant"

or "JPW"), as follows:

---

[1] In fact, as JPW acknowledges in a footnote, CTS has only substantively amended its
complaint once, not three times. The Amended Complaint was inadvertently filed
multiple times due to a clerical error.

1

## INTRODUCTION

The Motion to Dismiss should be denied. The Amended Complaint filed January 27, 2025 (the "Complaint") contains detailed, well-pled allegations that provide a factual foundation for each element of each cause of action. Specifically, the Complaint includes in-depth allegations of the market power of JPW and Amazon, a more refined description of the woodworking tool market at issue, identification of specific tools manufactured by JPW and sold by CTS, thorough descriptions of JPW's selective enforcement of the MAP policy and other anti-competitive conduct, and detailed allegations of competitive harm to consumers and CTS.

Moreover, the Complaint includes a revised breach of contract claim that is based on purchase orders and a course of dealing; it is not solely based on the terms contained in Sphere 1's Preferred Vendor Agreement & Program. It also brings two claims under Sections 2(a) and 2(d) of the Robinson-Patman Act, which have different elements and require different types of proof for damages. Simply put, the Complaint is dramatically different than the original complaint that the Court dismissed.

While the law requires this Court to construe the Complaint's factual allegations in the light most favorable to CTS, JPW attempts to impose an improper evidentiary burden on CTS at the motion-to-dismiss stage. Contrary to JPW's factual assertions, CTS properly states claims against JPW for violations of breach of contract (Count I), the Sherman Antitrust Act ("Sherman Act") (Count II), Section 2(a) of the Robinson-Patman Act (Count III), Section 2(d) of the Robinson-Patman Act (Count IV), the

Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") (Count V), and the Florida Antitrust Act (Count VI) in the Complaint. Therefore, this Court should deny the motion to dismiss.

## I.    BACKGROUND

As alleged in the Complaint, CTS is engaged in the business of purchasing and reselling woodworking tools to customers within the United States. (Compl., ¶ 11). JPW manufactures various woodworking tools, as well as related accessories, under certain brand names, including Axiom, JET, and Powermatic (collectively the "Products"). (Compl., ¶ 13). Specific examples of JPW's Products that are the subject of the Complaint include: (1) JET AFS-1000C Air Filtration System (SKU 713000), (2) JET JWL-1221CS, 12" x 21" Wood Lathe (SKU 719200), (3) JET JWBS-14SFX, 14-Inch Woodworking Bandsaw (SKU 714400K), and (4) JET JWDP-12, 12-Inch Benchtop Drill Press (SKU 716000). (Compl., ¶¶ 14, 63, 71, 73).

JPW maintains significant market power as it controls over 50% of the woodworking tool market within the United States. (Compl., ¶¶ 16-22). In some categories of woodworking tools, JPW wields even more market power. For example, JPW controls about 57.9% of the power drum sander market, 62.4% of the bandsaw market, and 75% of the dust and air filtration market. (Compl., ¶¶ 18-20).

Retailers such as Amazon and CTS purchase JPW's Products before reselling them to the end users. (Compl., ¶ 23). As alleged in the Complaint, the Federal Trade Commission recognizes that Amazon's share of the overall value of the online

3

superstore marketplace in the United States is 60% and rising. (Compl., ¶ 30.). Amazon also dominates approximately 60% of the online woodworking tool marketplace in the United States, which is approximately five times greater than that of Amazon's closest competitor. (Compl., ¶ 31).

While retailers like CTS are free to develop their own storefronts on Amazon's website, Amazon directly sells a wide array of woodworking tools, including JPW's Products, and is a direct competitor of CTS. (Compl., ¶ 34). In fact, Amazon was credited with approximately 95% of the online sales of JPW's Products before CTS began to compete with them on the same website. (Compl., ¶ 56).

CTS engaged in an aggressive marketing and competitive pricing strategy to effectively compete with the most powerful online distributor of woodworking tools in the United States. (Compl., ¶ 55-57). By 2023, CTS became JPW's third largest source of sales and was responsible for nearly 50% of JPW's online sales on the Amazon website. (Compl., ¶ 51).

Alarmed by JPW's emergence as a competitor, Amazon pressured JPW to vertically fix prices and to unreasonably limit CTS's ability to freely compete against Amazon in the market for JPW's Products. (Compl., ¶¶ 58-59, 70). As a result, JPW enacted a discriminatory pricing structure that provided a lower net price to Amazon over CTS. (Compl., ¶¶ 58, 76, 137). The discriminatory pricing structure included:

    a. JPW's coverage of priority shipping for sales of JPW's Products to Amazon (but not CTS), which reduced the net price of JPW's Products to

4

Amazon by approximately 10-25% of the sales price (Compl., ¶ 137(a));

b.  JPW's discriminatory and selective enforcement of the MAP Policy against CTS (but not Amazon and other retailers) for similar violations, which undercut CTS's ability to compete against Amazon and other retailers (Compl., ¶ 137(b));

c.  JPW's payment to Amazon of "charge back" fees to reimburse Amazon for sales that it believed it lost to CTS, which reduced the net sales price of JPW's Products to Amazon in the amount of the fees (Compl., ¶ 137(c));

d.  JPW's waiver of fees for credit card payments for Amazon (but not CTS), which reduced the net sales price of JPW's Products to Amazon by approximately 3% of the sales prices (Compl., ¶ 137(d));

e.  JPW's coverage of advertising costs for Amazon to sell JPW's Products on the Amazon marketplace, which reduced the net price of JPW's Products to Amazon by approximately 2-15% depending on the promotion (Compl., ¶ 153(a)); and

f.  JPW's inventory allocation preferential treatment of orders from Amazon (but not CTS), which harmed CTS's ability to timely fill orders for JPW's Products (Compl., ¶ 153(b)).

The direct result of these discriminatory practices is to substantially lessen competition in the sale of the Products over a substantial period of time in a market where

competition is keen. (Compl., ¶¶ 138, 155). Moreover, CTS has suffered damages of at least $3 million, in addition to the loss of significant market share to Amazon. (Compl., ¶¶ 139, 156).

## II.    LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(6), the trial court must accept all factual allegations in a complaint as true, as well as construe the allegations and draw all reasonable inferences in the light most favorable to the plaintiff. *E.g.*, *In re Disposable Contact Lens Antitrust*, 215 F.Supp.3d 1272, 1286-87 (M.D. Fla. 2016). To survive a motion to dismiss, plaintiffs need only allege "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Normally, specific facts are not necessary to accomplish this. *Id.* Instead, a complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* Thus, "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low." *E.g.*, *Spanish Broad Sys. of Fla., Inc. v. Clear Channel Commc'ns. Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).

The pleading standard is not heightened in antitrust cases. *Spanish Broad Sys. of Fla., Inc. v. Clear Channel Commc'ns. Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004) ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases.") And

6

since proof in these cases largely lies in the hands of the alleged conspirators, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976).

### III.    MEMORANDUM OF LAW

**A.** **<u>Count I Alleges Sufficient Facts to State a Claim for Breach of Contract.</u>**

In the motion, JPW misrepresents the breach of contract claim. JPW suggests that Count I failed because the purported contract is the "Preferred Vendor Agreement & Program" document that provides the terms offered by JPW to Sphere 1 members, including CTS. (Mot. to Dismiss, P. 2, 7-8). JPW further claims that the Sphere 1 term sheet is not an enforceable contract because it fails to specify the essential term of quantity, lacks consideration, and violates the statute of frauds. (Mot. to Dismiss, P. 2, 9-10).

Contrary to JPW's representations, CTS does not allege in Count I that JPW's offer of "Preferred Vendor" status to Sphere 1 members, including CTS, constitutes the entirety of the "contract." Count I simply alleges that the "Preferred Vendor Agreement & Program" was an offer by JPW to sell JPW's products to CTS on the same terms offered to other "preferred vendors" and at the prices detailed in JPW's confidential price books. (Compl., ¶¶ 102-103). CTS confirmed its acceptance of JPW's offer through its purchase orders. (Compl., ¶ 103). Copies of JPW's confidential price books and CTS's purchase order form the rest of the contract, and will be produced in

7

discovery pursuant to a confidentiality agreement. (Compl., ¶ 104). The complaint further alleges that a contractual relationship that incorporated the terms of the preferred vendor program, confidential price books, and purchase orders was formed through the parties' course of dealing and performance thereunder. (Compl., ¶ 105). However, JPW breached its contractual obligations by failing to reimburse CTS for certain advertised expenses and failing to honor orders placed by CTS for JPW's Products in retaliation for CTS's refusal to accept the illegal, anticompetitive policies of JPW. (Compl., ¶ 91-92).

JPW claims that the "Preferred Vendor Agreement & Program" does not specify the essential term of quantity. (Mot. to Dismiss, PP. 7-8). JPW's argument would be well-founded if CTS alleged that the Sphere 1 term sheet constituted the entirety of the contract, which CTS does not allege in Count I. Rather, the essential term of quantity is found in the purchase orders.

Similarly, JPW's claim that the contract lacks consideration overlooks both CTS's purchase orders and JPW's confidential price books. CTS purchased JPW's products in exchange for good and valuable consideration (e.g., monetary payment for the purchase of JPW's products). (Compl., ¶¶ 46-47, 48).

JPW's statute of frauds argument also fails because it ignores the purchase orders, term sheets, and price books that were created or accepted in writing by JPW. It is not enough for JPW to argue that it did not sign the Sphere 1 Preferred Vendor Agreement & Program because that it not the entirety of the contract. JPW has its own confidential

8

price books in its possession as well as all of the purchase orders. Such documents will be produced in discovery once a Stipulated Protective Order is in place. Until then, the Complaint adequately identifies the contract and all documents that form part of the contract.

### B. Count II Alleges Sufficient Facts to State a Claim for Violation of the Sherman Act.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. Thus, the Sherman Act applies to "concerted action that restrains trade." *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010). To state a claim under Section I of the Sherman Act, a plaintiff must plead "three elements: (1) a conspiracy that (2) unreasonably (3) restrains interstate trade or foreign commerce." *Okavage Group, LLC v. United Wholesale Mortgage, LLC,* Case No. 3:21-cv-448-BJD-LLL, 2022 WL 17478298, at *10 (M.D. Fla. July 27, 2022) (citing *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019)). In the Complaint, CTS alleges sufficient facts to plausibly establish each of these elements. *See generally id.* As such, for the reasons further explained below, this Court must deny JPW's Motion to Dismiss to the extent it improperly seeks premature dismissal of Count II of the Complaint.

### i. The Complaint alleges a conspiracy between JPW and Amazon.

"[T]he first element of a section 1 claim is proof of an agreement to restrain

trade." *Levine v. Central Fla. Medical Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996).

"An 'agreement' for purposes of § 1 of the Sherman Act, is 'a conscious commitment

to a common scheme designed to achieve an unlawful objective.'" *In re Disposable Contact*

*Lens Antitrust*, 215 F.Supp.3d at 1298 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465

U.S. 752, 764 (1984)). To survive a motion to dismiss, plaintiffs need only allege

"enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at

1288 (parenthetical in original, other citation omitted). This merely requires establishing

"plausible grounds to infer an agreement." *Id.* (quoting *Twombly*, 550 U.S. at 556-57).

Notably, "[a]sking for plausible grounds to infer an agreement <u>does not</u> impose a

probability requirement." *Id.* (emphasis added). Instead, "it simply calls for enough facts

to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). Thus, "a well-pleaded complaint

may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation

omitted).

Pursuant to these standards, CTS alleges sufficient facts to establish an unlawful

agreement under the Sherman Act. *See id.* For example, CTS expressly alleges the

existence of a conspiracy between Amazon and JPW to impose a resale price

maintenance agreement, which eliminates CTS's freedom to sell JPW's Products for

less than MAP. (Compl., ¶¶ 55-77, 108-125) (emphasis added). Thus, CTS presents

sufficient allegations in the Complaint to plausibly establish that Amazon and JPW

engaged in "a common scheme designed to achieve an unlawful objective." *See, e.g., id.*; *In re Disposable Contact Lens Antitrust*, 215 F.Supp.3d at 1287 (defining agreements under the Sherman Act).

JPW can only characterize CTS's allegations of a conspiracy as "conclusory" by overlooking the specific factual detail provided in the Complaint. For example, CTS specifically alleges that "Amazon embarked on a pressure campaign to induce JPW to provide a discriminatory pricing structure in favor of Amazon and with the express goal of reducing or eliminating CTS's position in the online market as a reseller of JPW's Products." (Compl., ¶ 58). Amazon specified pressured JPW to "selectively enforce the MAP Policy against CTS, but not against Amazon . . ."). (Compl., ¶ 70; *see also* Compl., ¶¶ 71-74). CTS also specifically alleges that Amazon's pressure campaign morphed into a resale price maintenance scheme in early 2024 when "Amazon's representatives met with . . . JPW, to discuss ways to control resale pricing of JPW's Products and to prevent CTS from selling in a manner that put competitive pressure on Amazon, and to reduce the net prices of JPW's Products to Amazon." (Compl., ¶ 61).[2] CTS also specifically alleges that JPW representatives informed CTS that Amazon was "causing a headache" for JPW and that Amazon pressured JPW to eliminate CTS's ability to compete in the market for woodworking tools within the United States. (Compl., ¶¶ 79, 99). Thus, in

---

[2] Plaintiffs may plausibly plead claims "upon information and belief" if the belief is based on factual information. *E.g.*, *MacSouth Forest Products, LLC v. Current Builders, Inc.*, Case No. 0:24-CV-60013, 2-24 WL 3650456, at *6 (S.D. Fla. July 26, 2024); *Scott v. Experian Information Solutions, Inc.*, Case No. 18-CV-60178, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018).

the Complaint, CTS alleges "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement" under the Sherman Act. *See, e.g., In re Disposable Contact Lens Antitrust*, 215 F.Supp.3d at 1288.

With respect to Count II, the conspiracy between Amazon and JPW entailed the imposition of a resale price maintenance agreement on most of JPW's distributors (excluding Amazon) by including "price in cart" as a violation of JPW's MAP policy. (Compl., ¶ 35-41, 78-83, 108-125). While CTS does not dispute that a MAP policy is permissible to the extent that it provides minimum *advertised* prices, a MAP policy cannot permissibly eliminate a distributor's freedom to sell Products for less than MAP. (Compl., ¶¶ 35-40). Moreover, MAP cannot be selectively enforced by a manufacturer in favor of one distributor over another as JPW did with respect to favoring Amazon over CTS. (Compl., ¶ 70).

JPW attaches one version of its 2024 MAP policy to the motion to dismiss. CTS denies that the 2024 MAP policy is the only version of the MAP policy that applied to the parties' relationship, which began in late 2021. (Compl., ¶ 42). Discovery will confirm that pre-2024 versions of the MAP policy did not include "price in cart" as a violation of JPW's MAP policy. As alleged in the Complaint, this form of resale price maintenance was introduced in March 2024 although JPW had been imposing a discriminatory pricing structure in favor of Amazon well before then. (Compl., ¶ 82).

JPW looks to the text of the 2024 MAP policy to support its contention that the 2024 MAP policy only applied to advertised prices and that "resellers are free to sell

[JPW's Products at any prices they elect." (Mot. to Dismiss, Ex. A, P. 3). In fact, the rest of the 2024 MAP policy belies this statement and confirms that JPW's revised MAP policy included "price in cart" as a violation. As the 2024 MAP policy states on page 3:

> The use of any language on the digital space to direct the consumer to the shopping cart for actual selling price is limited to; "We offer the best prices", "Call for Price", "Call with any questions", "Call for additional questions related to the product". In all these cases the MAP must be displayed on the page. Unacceptable language can be defined as "Price too low to display" "See Price in cart", "Add to Shopping Cart to See Price", etc., and are all violations of the MAP Policy. Any language that does not match the above or is not authorized by JPW Industries via an email confirmation from map.us@jpwindustries.com is considered a violation.

(Mot. to Dismiss, Ex. A, P. 3). Thus, there is no question that JPW added "price in cart" as a violation of the MAP policy.

The central factual question to be developed during discovery is whether JPW's 2024 MAP policy constitutes a resale price maintenance agreement under the antitrust rule of reason. JPW suggests that CTS will not be able to meet its burden of proof under any circumstance because JPW allows customers to call CTS for lower prices even if they cannot see those prices in the cart. (Mot. to Dismiss, P. 5). This suggestion, however, ignores the reality that "Amazon does not provide customers with phone numbers for competing retailers or facilitate the ability of customers to directly call competing retailers." (Compl., ¶ 41). In other words, the alleged ability of a customer shopping for woodworking tools to call CTS for a lower price is illusory with regard to

the Amazon website. Since calling is not an option on the website, the prohibition on offering lower prices "in cart" effectively prevents a distributor from actually selling a woodworking tool at a lower than MAP price. Thus, the 2024 MAP policy does not actually permit a reseller to sell one of JPW's Products on the Amazon website at any price they wish.

Since the Complaint specifically alleges that "Amazon does not provide customers with phone numbers for competing retailers or facilitate the ability of customers to directly call competing retailers," this factual allegation must be taken as true for purposes of the motion to dismiss. (Compl., ¶ 41). To the extent there is a factual dispute about the ability of Amazon customers to call distributors like CTS for lower prices, the dispute must be resolved by a trier of fact after an opportunity for the parties to conduct discovery. *Spanish Broad Sys. of Fla., Inc.*, 376 F.3d at 1070 ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases.").

> ii. **The Complaint alleges that the unlawful agreement between Amazon and JPW resulted in an unreasonable restraint on trade.**

"The Sherman Act prohibits only *unreasonable* restraints on trade." *Location 24, LLC v. Doctors Same Day Surgery Center, Inc.*, Case No. 8:22-cv-150-VMC-MRM, 2023 WL 2931458, at *7 (M.D. Fla. Jan. 18, 2023) (citing *Levine*, 72 F.3d at 1545) (emphasis in original, other citation omitted). "In deciding whether an alleged restraint is unreasonable, a court generally analyzes the claim under one of two frameworks—the rule of reason or the per se rule." *Okavage Group*, 2022 WL 17478298, at *10. "The

presumption in cases brought under Section 1 of the Sherman Act is that the rule-of-reason standard applies." *E.g.*, *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991). In fact, courts use the rule of reason to evaluate "nearly every . . . vertical restraint" on trade. *E.g.*, *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018); *see also Leegin*, 551 U.S. at 907 (all vertical price restraints); *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1333, 1336 (11th Cir. 2010) (all vertical resale price maintenance agreements).

"As its name suggests, the rule of reason requires the factfinder to decide whether[,] under all the circumstances of the case[,] the restrictive practice imposes an unreasonable restraint on competition." *E.g.*, *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008) (quoting *Arizona v. Maricopa Cnty. Medical Society*, 457 U.S. 332, 343 (1982)) (alteration and other citations omitted). Thus, to satisfy the rule of reason, plaintiffs must establish that a restraint "had an adverse effect on competition." *All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*, 135 F.3d 740, 749 (11th Cir.1998) (internal quotation and other citation omitted). Plaintiffs may establish this by showing actual or potential harm to competition. *E.g.*, *Jacobs*, 626 F.3d at 1336. Competition, however, only occurs in a market. *All Care Nursing Service*, 135 F.3d at 749. Thus, before courts may reach the larger question of whether defendants violated any antitrust laws, they "must confront the threshold problem of defining the relevant market." *Id.*

For purposes of the Sherman Act, the relevant market consists of the specific

geographic and product markets at issue. *E.g.*, *Location 24*, 2023 WL 2931458, at *7 (citing *Moecker v. Honeywell Int'l, Inc.*, 144 F.Supp.2d 1291, 1301 (M.D. Fla. 2001)). "Importantly, a market's product and geographic dimensions are questions of fact that often require discovery to precisely articulate." *Id.* (other citations omitted). Plaintiffs, therefore, need not plead them with specificity. *E.g.*, *id.* As such, "to survive a motion to dismiss, antitrust plaintiffs need only present enough information in their complaint to plausibly suggest those dimensions . . . ." *Id.* (quoting *Jacobs*, 626 F.3d at 1336) (alterations and internal quotations omitted).

Here, CTS sufficiently alleges the relevant geographic and product markets. *See generally id.*; (Compl., ¶¶ 13, 16). First, CTS directly alleges that "[t]he relevant geographic market is the United States." (Compl., ¶ 22). Second, CTS sufficiently alleges enough information to establish the contours of the specialized market. *See generally*, *e.g.*, *Location 24*, 2023 WL 2931458, at *7. For instance, CTS alleges that "Woodworking tools comprise the relevant product market, or submarket, separate and distinct from the general market for tools, because they are highly specialized, unique, and not interchangeable with other types of tools." (Compl., ¶ 21). CTS also alleges that "JPW manufactures woodworking tools . . . under reputable brand names, including Axiom, JET, and Powermatic" and provides examples of the some of the tools in question. (Compl., ¶¶ 13-14). Thus, the Complaint contains sufficient allegations to plausibly establish the contours of the relevant geographic and product market. *See generally*, *e.g.*, *id.*; *Location 24*, 2023 WL 2931458, at *7.

Upon identifying the relevant market, plaintiffs need only allege sufficient allegations to plausibly demonstrate actual or potential harm to competition in the market. *E.g.*, *Jacobs*, 626 F.3d at 1339. To establish actual harm, plaintiffs must indicate "a factual connection between the alleged harmful conduct and its impact on competition in the market." *Id.* "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Id.*

Absent actual harm, plaintiffs may still plausibly state a claim for violation of the Sherman Act by providing sufficient allegations to plausibly suggest potential harm to competition. *Id.* To establish potential harm, plaintiffs need only allege that the defendants possessed power in the relevant market, then make "specific allegations linking market power to harm to competition in that market."[3] *E.g. id.*; *In re Disposable Contact Lens Antitrust*, 215 F.Supp.3d at 1302 (quoting *Spanish Broad. Sys.*, 376 F.3d at 1073).

In the Complaint, CTS makes sufficient allegations of market power. JPW maintains significant market power as it controls over 50% of the woodworking tool market within the United States. (Compl., ¶¶ 16-22). In some categories of woodworking tools, JPW controls up to 75% of the market. (Compl., ¶¶ 18-20).

---

[3] Market power refers to "the ability to raise price significantly above the competitive level without losing all of one's business." *E.g.*, *Graphic Products Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983). In litigation, courts frequently use market share as a surrogate for market power, due to the conceptual difficulty in defining it. *Id.* In fact, measuring market power "requires sophisticated econometric analysis." *Id.* Courts, therefore, must not perform such factual analysis at the motion-to-dismiss stage. *See id.*

Similarly, as recognized by the Federal Trade Commission, Amazon's share of the overall value of the online superstore marketplace in the United States is 60% and rising. (Compl., ¶ 30.). Amazon also dominates approximately 60% of the online woodworking tool marketplace in the United States, which is approximately five times greater than that of Amazon's closest competitor. (Compl., ¶ 31.)

The Complaint also contains sufficient allegations linking the abuse of market power to harm competition to the injury of consumers in the form of higher prices and decreased availability of JPW's Products. (Compl., ¶ 119). JPW has also adversely affected interbrand competition for woodworking tools by artificially increasing the prices for its own Products and incentivizing competing woodworking machinery and tools brands to also increase their prices. (Compl., ¶ 122). Thus, CTS presents sufficient allegations in the Complaint to plausibly allege potential harm to competition, as well as actual harm to competition. *See, e.g., id.; In re Disposable Contact Lens Antitrust*, 215 F.Supp.3d at 1303-04.

### iii. The Complaint properly pleads that JPW's illegal conduct had an effect on interstate commerce.

"It is well established that jurisdiction under the Sherman Act does not require that the activities in question actually occur in interstate commerce." *E.g., Construction Aggregate Transport, Inc. v. Florida Rock*, 710 F.2d 752, 766 (11th Cir. 1983). Rather, plaintiffs need only allege "either that the business activities occurred in commerce or that those activities had an effect on commerce." *Id.* As such, it suffices to allege the

existence of customers in states other than Florida. *See id.*

In the Complaint, CTS specifically alleges implications to interstate commerce in numerous paragraphs of the Complaint. *See, e.g., id.*; (Compl., ¶¶ 13-14, 16, 18). For example, CTS specifically states that "[d]istributors like CTS resell the Products <u>in interstate commerce</u> through brick-and-mortar stores as well as online to <u>customers throughout the United States</u>." (Compl., ¶ 18) (emphasis added). CTS also expressly alleges that JPW's Products are "recognized . . . throughout the United States" and that "JPW maintains significant market power throughout the United States." (Compl., ¶¶ 13-14). Thus, CTS sufficiently alleges an effect on interstate commerce in the Complaint. *See, e.g., id.*

As such, CTS plausibly establishes all three elements necessary to state a claim under Section One of the Sherman Act. This Court must, therefore, deny JPW's Motion to Dismiss to the extent that it erroneously seeks to dismiss Count II of the Complaint.

## C. <u>Count III States a Claim for Violation of Section 2(a) of the Robinson-Patman Act.</u>

Section 2(a) of the Robinson-Patman Act prohibits the sale of the same commodity (or goods of like grade or quality) at different prices to two competing buyers by one seller if the result is harm to competition. 15 U.S.C. § 13(a). Thus, to state a claim under Section 2(a), "a plaintiff must show (1) that the defendant discriminated in price, discounts, or services between purchasers of commodities of like grade and quality in the course of interstate commerce; (2) that the price discrimination resulted

in the requisite injury to competition or competitors; and (3) at least the approximate amount of damages." *E.g.*, *Walker v. Hallmark Cards, Inc.*, 992 F.Supp. 1335, 1338 (M.D. Fla. 1997). Since a liberal pleading standard is applied in antitrust cases, plaintiffs need not spell out these three elements with exactitude or specificity. *E.g.*, *Tires Inc. of Broward v. Goodyear Tire & Rubber Co.*, 295 F.Supp.2d 1349, 1353 (S.D. Fla. 2003); *City of Gainesville v. Florida Power & Light Co.*, 488 F.Supp. 1258, 1263, n.2 (S.D. Fla. 1980). Instead, plaintiffs must merely plead "enough data" to enable a defendant to properly identify "each element of the alleged antitrust violation." *Quality Foods de Centro America, S.A. v. Latin American*, 711 F.2d 989, 995 (11th Cir. 1983).

Count III alleges each of the elements with specificity and factual support. Amazon and CTS compete against each other in the woodworking tool market and in the sale of JPW's Products in the United States. (Compl., ¶ 129). The Products that JPW sold to Amazon and CTS during the period of 2021-2024 for resale include power drum sanders, bandsaws, and dust and air filtration systems. (Compl., ¶ 131-135). Specific examples of these Products include, without limitation: (1) JET AFS-1000C Air Filtration System (SKU 713000), (2) JET JWL-1221CS, 12" x 21" Wood Lathe (SKU 719200), (3) JET JWBS-14SFX, 14-Inch Woodworking Bandsaw (SKU 714400K), and (4) JET JWDP-12, 12-Inch Benchtop Drill Press (SKU 716000). (Compl., ¶¶ 14, 63, 71, 73). The Products sold to CTS and Amazon were identical, of like grade and quality, and have no material physical differences that matter to the customers of CTS and Amazon. (Compl., ¶ 133).

20

As alleged in the Complaint, JPW violated Section 2(a) by selling the Products to Amazon at a lower net price than JPW sold the Products to CTS. (Compl., ¶ 136). The discriminatory pricing structure that resulted in a lower net price to Amazon includes:

a.  JPW's coverage of priority shipping for sales of JPW's Products to Amazon (but not CTS), which reduced the net price of JPW's Products to Amazon by approximately 10-25% of the sales price;

b.  JPW's discriminatory and selective enforcement of the MAP Policy against CTS (but not Amazon and other retailers) for similar violations, which undercut CTS's ability to compete against Amazon and other retailers;

c.  JPW's payment to Amazon of "charge back" fees to reimburse Amazon for sales that it believed it lost to CTS, which reduced the net sales price of JPW's Products to Amazon in the amount of the fees; and

d.  JPW's waiver of fees for credit card payments for Amazon (but not CTS), which reduced the net sales price of JPW's Products to Amazon by approximately 3% of the sales prices.

(Compl., ¶ 137). This discriminatory pricing structure resulted in a lower net price to Amazon in the range of at least 13-40%, which substantially lessened competition in the sale of the Products and harmed consumers of the Products. (Compl., ¶¶ 137-138). It also resulted in monetary losses of at least $3 million to CTS in 2024. (Compl., ¶¶ 139-140).

The motion to dismiss makes several flawed arguments against Count III. First, JPW claims that CTS has not alleged a cognizable antitrust injury apart from JPW ending its business relationship with CTS. (Mot. to Dismiss, P. 17). In fact, Count III seeks damages for "lost profits from displaced sales caused by the discriminatory pricing structure in favor of Amazon," and not from JPW's refusal to honor CTS's purchase orders. (Compl., ¶ 140).

Count III also alleges an antitrust injury to consumers since the effect of the significant price discrimination in favor of Amazon is to "substantially lessen competition in the sale of the Products over a substantial period of time in a market where competition is keen." (Compl., ¶ 138). As the U.S. Supreme Court recognized in *Federal Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 45 (1948), the existence of this type of injury may be established by evidence of displaced sales or by proof of substantial price discrimination between competing purchasers over time. *See also Falls City Indus. v. Vanco Beverage, Inc.,* 460 U.S. 428, 435 (1983). Thus, the allegations of JPW's substantial price discrimination and displaced sales in favor of Amazon give rise to a *Morton-Salt* presumption of market injury. *See Morton Salt Co.*, 334 U.S. at 45.

JPW also erroneously cites a February 2024 meeting referenced in paragraph 64 of the Complaint to make the factual inference that "Amazon began receiving those alleged discriminatory benefits from JPW no earlier than February 2024 . . ." and that "CTS could not have begun losing sales to Amazon due to alleged discriminatory benefit Amazon received from JPW until after March 2024 at the earliest," which was

22

around the time JPW refused to fulfill CTS orders. (Mot. to Dismiss, PP. 18-19). Setting aside the factual claims and inference inherent in JPW's argument (which CTS disputes), this argument ignores the well-plead allegations that JPW's discriminatory pricing structure in favor of Amazon began well before February 2024. (Compl., ¶¶ 71-74, 79), As alleged in the Complaint, JPW refused to enforce its own MAP policy against Amazon on September 19, 2023 (Compl., ¶¶ 71-72) and September 26, 2023 (Compl., ¶¶ 73-74), which was several months before a JPW representative informed CTS in February 2024 that Amazon had been "causing a headache" for JPW (Compl., ¶ 79). Thus, the alleged discriminatory pricing structure had begun to emerge in 2023 well before Amazon's pressure campaign came to a full head in 2024.

JPW further suggests that Count III should be dismissed because "CTS does not adequately allege the pricing discounts received by Amazon are not legitimate functional discounts." (Mot. to Dismiss, P. 21). In fact, the Complaint specifically alleges that "[n]o legal justification exists for JPW's discriminatory pricing." (Compl., ¶¶ 141, 158). The Complaint further establishes that the real reason for the discriminatory pricing structure was Amazon's fear of competition and desire to eliminate CTS as a competing distributor of JPW's Products, which is hardly a legitimate justification for the discriminatory pricing structure. (Compl., ¶¶ 58-89). To the extent that JPW believes it can provide a legitimate justification for the discriminatory pricing structure, JPW may raise that through an affirmative defense and develop factual support for the affirmative defense through discovery. However, at the motion to dismiss stage, it would be

inappropriate to dismiss the Complaint in anticipation of an affirmative defense that has yet to be raised, much less established by JPW.

### IV. Count IV States a Claim for Violation of Section 2(d) of the Robinson-Patman Act.

Section 2(d) of the Robinson-Patman Act is a *per se* prohibition of the discriminatory provision of or payment for certain promotional aids meant to assist in the resale of a seller's commodity. Unlike a claim under Section 2(a), a claim under Section 2(d) does not require proof of harm to competition. Thus, even if the Complaint is deemed to have insufficient allegations of harm to competition, Count IV may not be dismissed on that basis.

As alleged in the Complaint, the *per se* violation of Section 2(d) occurred when JPW paid for certain promotional allowances used by Amazon in the resale of JPW's Products without offering similar promotional allowances to CTS on proportionally equal terms. (Compl., ¶¶ 153-154). Specifically, the discriminatory promotional allowances included:

a. JPW's coverage of advertising costs for Amazon to sell JPW's Products on the Amazon marketplace, which is a classic example of a promotional allowance, and which also reduced the net price of JPW's Products to Amazon by approximately 2-15% depending on the promotion; and

b. JPW's inventory allocation preferential treatment of orders from Amazon (but not CTS), which harmed CTS's ability to timely fill orders for JPW's

Products.

(Compl., ¶ 153). The effect of the discriminatory payment of the promotional allowances was to substantially lessen competition. (Compl., ¶ 154). However, harm to competition is not an essential element of a Section 2(d) claim and CTS has alleged monetary losses exceeding $3 million in 2024 alone due to displaced sales caused by the discriminatory promotional allowances afforded to Amazon. (Compl., ¶ 157).

## V.    Count V States a Claim under FDUPTA.

Plaintiffs may sufficiently state a claim under FDUPTA by alleging a violation of federal antitrust law. *E.g.*, Fla. Stat. § 501.203(3); *Morris Communications Corp. v. PGA Tour, Inc.*, 235 F.Supp.2d 1269, 1286-87 (M.D. Fla. 2002). "Of course, when an antitrust claim serves as the sole basis for a FDUPTA claim, the success of the latter rises or falls with that of the former." *AT&T Mobility LLC v. Phone Card Warehouse*, No. 6:08-cv-1909-Orl-18, 2009 WL 10671270, at *5 (M.D. Fla. June 25, 2009).

In Count V of the Complaint, CTS specifically pleads a state FDUPTA claim premised on violations of the Sherman Act and the Robinson-Patman Act. *See generally*, *e.g.*, *id.*; (Compl., ¶ 108). Thus, if Count II, Count III, or Count IV of the Complaint plausibly states a claim, then Count V necessarily states a plausible claim too. *See id.* This Court must, therefore, deny JPW's Motion to Dismiss to the extent that it seeks dismissal of Count V of the Complaint.

## VI.    Count VI Sufficiently States a Claim under the Florida Antitrust Act.

Courts analyze the Florida Antitrust Act and the Sherman Act under the same rules and case law. *E.g.*, *Okavage Group*, 2022 WL 17478298, at *3, n. 4 (citing *All Care Nursing*, 135 F.3d at 745, n.11). As such, for the same reasons described above that CTS plausibly states a claim under the Sherman Act in Count II of the Complaint, CTS plausibly states a claim under the Florida Antitrust Act in Count V of the Complaint. *See*, *e.g.*, *Lockheed Martin Corp. v. Boeing Co.*, 314 F.Supp.2d 1198, 1224 (M.D. Fla. 2004) (requiring plaintiffs allege identical elements to state a claim under the Sherman Act and the Florida Antitrust Act); (Compl., ¶¶ 113-114). This Court must, therefore, deny JPW's Motion to Dismiss to the extent that it seeks dismissal of Count VI of the Complaint. *See*, *e.g.*, *Okavage Group*, 2022 WL 17478298, at *3, n. 4 (applying the court's analysis of the Sherman Act "equally to" violations alleged under the Florida Antitrust Act).

## VII.    Conclusion

For the foregoing reasons, the Motion to Dismiss should be denied.

WHEREFORE, Plaintiff, Contractor Tool Supply, Inc. a/k/a Vera Tools, requests that this Honorable Court deny Defendant's Motion to Dismiss Complaint or, in the alternative, grant Plaintiff leave to file a Second Amended Complaint.

**DATED** this 20th day of March, 2025.

/s/ *Michael C. Kelley*
Michael C. Kelley, Esq. (FBN: 99492)
Adam Brandon, Esq. (FBN: 99316)
Caitlin N. Emling, Esq. (FBN: 1026551)
**LAWSON HUCK GONZALEZ, PLLC**
4705 South Apopka Vineland Rd., Suite 210
Orlando, FL 32819
Phone: (407) 710-9950
michael@lawsonhuckgonzalez.com
adam@lawsonhuckgonzalez.com
caitlin@lawsonhuckgonzalez.com
kim@lawsonhuckgonzalez.com

*BONA LAW PC*
James Lerner (pro hac vice forthcoming)
(New York Bar No. 2371599)
Steven Cernak (pro hac vice forthcoming)
(Michigan Bar No. P43089)
41 Madison Avenue #2509
New York, NY 10010
(212) 634-6861
James.lerner@bonalawpc.com
Steven.cernak@bonalawpc.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been filed with

the CM/ECF website and served on March 20th, 2025 to all counsel of record.


/s/ *Michael C. Kelley*
Michael C. Kelley, Esq.