# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**CONTRACTOR TOOL SUPPLY, INC.,**

        **Plaintiff,**

**v.**                               **CASE NO. 5:24-cv-347-JA-PRL**

**JPW INDUSTRIES, INC.,**

        **Defendant.**

_____

## ORDER

This case is before the Court on Defendant's motion to dismiss the amended complaint (Doc. 36)[1] and Plaintiff's response (Doc. 38). Based on the Court's review of the parties' submissions, the motion must be granted in part and denied in part.

## I.     BACKGROUND

Plaintiff, Contractor Tool Supply, Inc. (CTS), is a distributor of specialized woodworking tools operating through its brick-and-mortar store, its website, and Amazon.com. (Am. Compl. ¶¶ 11, 13, 23, 24, 26, 29). Defendant, JPW Industries, Inc. (JPW), is a leading manufacturer of multiple woodworking-tool

---

[1] Plaintiff explains that it inadvertently filed the same amended complaint multiple times due to a "clerical error." (*See* Docs. 33, 34, & 35; Doc. 38 at 1). The Court will refer to the last-filed of these (Doc. 35) as the Amended Complaint.

brands, including Axiom, JET, and Powermatic, and controls over half of the woodworking-tool market in the United States.[2] (*Id.* ¶¶ 13, 16–22). In the autumn of 2021, JPW included CTS in its Sphere 1 Preferred Vendor Agreement & Program wherein JPW agreed to provide CTS with favorable trading terms so long as CTS met JPW's volume requirements. (*Id.* ¶¶ 42–44). By 2023, JPW's representatives had "repeatedly praised CTS for dramatically increasing the sales of JPW's Products," and CTS became the third largest source of sales for JPW. (*Id.* ¶¶ 50–52).

JPW maintains a Minimum Advertised Price (MAP) policy, meaning that resellers of JPW's tools are prohibited from advertising those tools for sale below a price point defined by JPW. (*Id.* ¶¶ 36, 70; Doc. 36-1 at 3). The MAP policy is referenced in the Amended Complaint and attached as an exhibit to JPW's motion. (Am. Compl. ¶¶ 36, 70, 83, 115; Doc. 36-1). In light of the pleadings and the parties' briefings on the motion to dismiss, the Court finds the MAP policy is "(1) central to the plaintiff's claims[] and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). It therefore may be considered at this stage of the case. *See id.*

---

[2] JPW asserts in its motion to dismiss that CTS's allegation that JPW controls over fifty percent of the woodworking-tool market in the United States is "implausibl[e]." (Doc. 36 at 15). However, "for the purposes of a motion to dismiss [the court] must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

at 1300–01. The MAP policy states that language prompting online customers to see a discounted price in the online shopping cart is a violation of the policy but that resellers may communicate below-MAP prices to customers in other ways, such as by phone. (Doc. 36-1 at 3).

Even though CTS was permitted to sell JPW's tools on Amazon.com, Amazon itself also distributes JPW's tools and was therefore a competitor to CTS. (*Id.* ¶ 56). Before CTS began competing with Amazon for online sales of JPW's tools in 2021, Amazon was responsible for approximately ninety-five percent of the online sales of JPW's products. (*Id.* ¶ 56). By late 2023, CTS was credited with approximately forty-five percent of the online sales of JPW's tools, while Amazon's share decreased to about fifty percent. (*Id.* ¶ 57).

Dissatisfied with the decline in its market share, Amazon embarked on a "pressure campaign" to induce JPW to give Amazon favorable pricing with the aim of undercutting CTS's position. (*Id.* ¶ 58). In a February 2024 meeting between JPW and Amazon representatives, JPW agreed to make several exclusive concessions to Amazon that were designed to give Amazon an advantage in the market. (*Id.* ¶ 61). These concessions included: (1) priority shipping, (*id.* ¶¶ 62–63); (2) preferential inventory allocation, (*id.* ¶ 64); (3) priority order fulfillment, (*id.* ¶ 65); (4) chargebacks from JPW for lost business and elimination of discounts for other distributors, (*id.* ¶ 66); (5) waived fees

from credit card payments and the elimination of this benefit for CTS, (*id.* ¶ 67); (6) funding from JPW to market and sell JPW's products at a discount, (*id.* ¶ 68); (7) removal of CTS from the 2024 Sphere 1 Preferred Vendor Agreement & Program, (*id.* ¶ 69); and (8) selective enforcement of the MAP policy against CTS, (*id.* ¶ 70–71).

Based on this alleged agreement with Amazon, JPW's representatives sent CTS an email on March 11, 2024, stating that: (1) CTS could no longer provide "Price in Cart" discounts on Amazon.com under JPW's MAP policy; (2) additional fees for credit card payments would be imposed; (3) rebates for sales generated through CTS's brick-and-mortar store would be limited; (4) JPW would adjust rebates and sales goals for CTS; (5) CTS was required to strive to generate less than five percent of its sales through Amazon; (6) CTS's Amazon storefront would be managed by JPW's eCommerce team; and (7) CTS could not sell or stock through Amazon. (*Id.* ¶¶ 81–89). CTS rejected the items that JPW proposed in the March 11 email, prompting JPW to cease filling CTS's orders for its products. (*Id.* ¶¶ 90–91).

CTS alleges that it has suffered damages because JPW unlawfully breached the parties' agreement and placed unreasonable restraints on trade. (Am. Compl. ¶¶ 107, 139, 156). CTS now sues JPW for breach of contract (Count 1) and for violations of the Sherman Act, 15 U.S.C. § 1 (Count 2), the Robinson-

Patman Act (RPA), 15 U.S.C. § 13 (Counts 3 & 4), the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), §§ 501.201-501.213, Fla. Stat. (Count 5), and the Florida Antitrust Act, § 542.18, Fla. Stat. (Count 6).

## II.   LEGAL STANDARDS

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). In considering a Rule 12(b)(6) motion to dismiss, a court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

## III.   DISCUSSION

### A.   Breach of Contract (Count 1)

In Count 1, CTS alleges that JPW breached the parties' contract by refusing to fill CTS's orders and failing to reimburse CTS for advertised

5

expenses. (Am. Compl. ¶¶ 91–92). CTS has identified three items that, in combination with each other and with the parties' course of dealing, allegedly constitute a contract: the Sphere 1 Preferred Vendor Agreement & Program, (*id.* ¶ 102); CTS's purchase orders, (*id.*); and JPW's confidential price books, (*id.* ¶ 103). In the motion to dismiss, JPW argues that CTS fails to plead sufficient facts to establish the existence of a contract because: (1) CTS does not detail the essential term of quantity; (2) CTS does not adequately allege that the purported contract is supported by valuable consideration; and (3) the purported contract does not comply with the statute of frauds.

Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). "[A]n enforceable contract can consist of several instruments in writing" so long as the instruments "show an actual meeting of the minds of the contracting parties." *Yun Enters., Ltd. v. Graziani*, 840 So. 2d 420, 422 (Fla. 5th DCA 2003);[3] *see also Webster Lumber Co. v. Lincoln*, 115 So. 498, 502 (Fla. 1927)). "It is adequate for [a plaintiff] to allege

---

[3] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983).

that a contract exists[] without attaching the contract to the complaint in federal court." *Yencarelli v. USAA Cas. Co.*, No. 8:17-cv-2029-T, 2017 WL 6559999, at *2 (M.D. Fla. Dec. 22, 2017).

Woodworking tools are "goods" under Florida's adoption of the Uniform Commercial Code (UCC). *See* § 672.105(1), Fla. Stat. (defining "goods" as "all things . . . which are movable at the time of identification to the contract for sale"). Thus, the parties' transactions are governed by the UCC. *See* § 672.102, Fla. Stat. ("[The UCC] applies to transactions in goods.").

Florida adopted the UCC's statute of frauds provision, which provides that a "contract is not enforceable . . . beyond the quantity of goods shown in such writing." § 672.201(1), Fla. Stat. Therefore, "without a quantity term, [a] contract would be unenforceable." *Off. Pavilion S. Fla., Inc. v. ASAL Prods., Inc.*, 849 So. 2d 367, 371 (Fla. 4th DCA 2003). Moreover, "[i]t is a fundamental principle of contract law that a promise must be supported by consideration to be enforceable." *Id.* at 370.

CTS's allegations are sufficient to state a claim for breach of contract under Florida law. CTS alleges that the parties entered into a written agreement for the sale of a definite number of woodworking tools, that CTS was prepared to pay an agreed-upon price in exchange for those tools, and that JPW unilaterally breached the agreement by refusing to fill CTS's purchase orders

7

and reimburse CTS for advertising expenses. (Am. Compl. ¶¶ 102–07). Taking CTS's allegations as true, the Court cannot say that, as a matter of law, there was no contract formed between the parties under the UCC. *See Strout v. Sch. Bd. of Broward Cnty.*, No. 15-61257-CIV, 2016 WL 4804075, at *8 (S.D. Fla. Feb. 1, 2016) (explaining that the issue of contract formation "is typically a question for the factfinder"). "In discovery, the parties may explore multiple avenues for proving whether there was a meeting of the minds here, including the previous course of dealing between the parties, the representatives' subjective intention[s] . . . and/or industry custom and practice." *Fertilizantes Tocantins S.A. v. TGO Agric. (USA), Inc.*, 599 F. Supp. 3d 1193, 1205 (M.D. Fla. 2022). The motion to dismiss CTS's breach of contract claim (Count 1) must be denied.

## B.    Sherman Act Claim (Count 2)

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Despite its sweeping language, section 1 has been interpreted to prohibit only *unreasonable* restraints on trade. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Section 1 "applies both to agreements between companies that directly compete with one another, called 'horizontal' agreements, and to agreements between businesses operating at different levels of the same

8

product's production chain or distribution chain, known as 'vertical' agreements." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004). CTS alleges the existence of a vertical agreement between JPW and Amazon to restrain trade. (Am. Compl. ¶ 80).

"By its terms, § 1 . . . 'only prohibits concerted action and, thus, requires some agreement, express or implied, between two or more persons.'" *AT&T Mobility LLC v. Phone Card Warehouse, Inc.*, No. 6:08-cv-1909-Orl-18GJK, 2009 WL 10671271, at *3 (M.D. Fla. Dec. 14, 2009) (quoting *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585-T, 2005 WL 1126665, at *12 (M.D. Fla. May 9, 2005)). Thus, to state a claim under the Sherman Act, a plaintiff must first allege "enough factual matter (taken as true) to suggest that an agreement [to restrain trade] was made." *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1288 (M.D. Fla. 2016). If the plaintiff has adequately alleged the existence of a vertical agreement to restrain trade, the Court will then analyze that agreement "according to the rule of reason." *Leegin Creative Leather Prods.*, 551 U.S. at 907.

### 1.    *JPW's Alleged Resale-Price Maintenance Agreement*

The first question is whether CTS has adequately alleged the existence of an agreement to restrain trade. CTS alleges that JPW and Amazon conspired to establish a "resale price maintenance" scheme by including "Price in Cart" as a

violation of JPW's MAP policy. (Am. Compl. ¶¶ 55–77, 83). "Resale-price maintenance" is defined as "[a] form of price-fixing in which a manufacturer forces or persuades several different retailers to sell the manufacturer's product at the same price, thus preventing competition." *Resale-Price Maintenance*, Black's Law Dictionary (12th ed. 2024). To adequately allege resale-price maintenance, a plaintiff "must allege at least some facts which would support an inference that the parties have agreed that one will set the price at which the other will resell the product or service to third parties." *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1360 (10th Cir. 1989) (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968), *overruled on other grounds by State Oil Co. v. Khan*, 522 U.S. 3 (1997)).

CTS concedes that a manufacturer may permissibly regulate advertised retail prices of its products so long as the manufacturer does not prohibit a distributor from selling the products for less than the advertised price. (*Id.* ¶¶ 35–40). However, CTS alleges that JPW's inclusion of "Price in Cart" as a violation of JPW's MAP policy functionally operates as a resale-price maintenance agreement because Amazon does not facilitate any other way for CTS to communicate below-MAP prices to its customers. (*Id.* ¶ 41). JPW responds that, at most, CTS has alleged an agreement to restrict advertising, which is insufficient to establish the existence of an agreement to restrain trade.

10

In general, restrictions on advertising "cannot be the basis of a vertical [resale-price maintenance] claim because [a MAP policy] does not restrain resale prices, but merely restricts advertising." *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, No. 10 CIV. 7781 NRB, 2011 WL 4352390, at *5 (S.D.N.Y. Sept. 15, 2011); *see also Blind Dr. Inc. v. Hunter Douglas, Inc.*, No. C-04-2678 MHP, 2004 WL 1976562, at *7 (N.D. Cal. Sept. 7, 2004); *Campbell v. Austin Air Sys., Ltd.*, 423 F. Supp. 2d 61, 69 n.6 (W.D.N.Y. 2005). However, CTS alleges that JPW's prohibition on "Price in Cart" discounts makes selling JPW's tools at below-MAP prices impracticable on Amazon. *See Acquaire v. Canada Dry Bottling Co. of N.Y., Inc.*, 24 F.3d 401, 406 (2d Cir. 1994) (affirming the district court's adoption of the magistrate judge's report and recommendation; noting magistrate's concern about "enforce[ment] [of] resale price maintenance in the guise of enforcing compliance with [a] promotional program"); *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 290–91 (4th Cir. 2009) (noting a company could strategize to "evade[] the rule against resale price maintenance by labeling its arrangement" in a way "to avoid antitrust scrutiny").

Accepting all the well-pleaded allegations in the Amended Complaint as true, the Court finds CTS has plausibly alleged the existence of resale-price maintenance as it pertains to JPW's tools sold on Amazon. *See also Twombly*, 550 U.S. at 555 ("[A] well-pleaded complaint may proceed even if it strikes a

11

savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))).

### 2.    Rule of Reason

Vertical restraints on trade such as resale-price maintenance agreements "are unlawful only if an assessment of market effects, known as the 'rule of reason' analysis, reveals that the vertical agreements unreasonably restrain trade." *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d at 1291 (citing *Leegin Creative Leather Prods.*, 551 U.S. at 885–86). To state a claim under the rule of reason, an antitrust plaintiff must allege "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996). To do so, an antitrust plaintiff must plead "(1) a geographic market and (2) a product market," as well as "actual or potential harm to competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464 (3d Cir. 1998)). JPW has not challenged whether CTS has adequately alleged the relevant geographic and product markets, (*see* Am. Compl. ¶¶ 11, 14, 21), and the Court does not otherwise find them to be deficient, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962) (holding that

12

"the geographic market in some instances may encompass the entire Nation" and that "men's, women's, and children's shoes" is an adequately defined product market). Thus, the question is whether CTS has "adequately allege[d] actual or potential harm to competition" resulting from the alleged resale-price-maintenance agreement in this case. *Jacobs*, 626 F.3d at 1336.

"Actual harm is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market . . . ." *Id.* at 1339 (citing *Spanish Broad. Sys.*, 376 F.3d at 1072). To state a claim, an antitrust plaintiff must make "specific factual allegations" of the actual anticompetitive effects of the defendant's conduct. *Id.* (quoting *Spanish Broad. Sys.*, 376 F.3d at 1073). "By 'anticompetitive,' the law means that a given practice both harms allocative efficiency and could 'raise[ ] the prices of goods above competitive levels or diminish[ ] their quality . . . .'" *Id.* (bracketed alterations in original) (emphasis removed) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)). "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Id.* (citing *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)). "Higher prices alone are not the 'epitome' of anticompetitive harm . . . . Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act." *Id.*

13

Here, CTS has not plausibly alleged any actual injury to competition within the woodworking-tool market. CTS alleges that the elimination of "Price in Cart" discounts has "harmed consumers through increased prices and decreased availability of JPW's products." (Am. Compl. ¶ 119). But CTS points to no examples of higher prices or decreased availability for any of JPW's tools— in fact, the only prices of JPW's tools referenced in the Amended Complaint are below-MAP prices that were allegedly advertised by Amazon. (*Id.* ¶¶ 71, 73). In the Eleventh Circuit, "bald statement[s]" of harm to competition, without specific examples, are inadequate to "establish[] the competitive level above which [a defendant's] allegedly anticompetitive conduct artificially raised prices." *Jacobs*, 626 F.3d at 1339.

Failing to plausibly plead actual harm to competition, CTS's "only avenue of relief [is] to sufficiently allege potential harm." *Id.* To do so, CTS must (1) "define the relevant market and establish that the defendant[] possessed power in that market" and (2) make "specific allegations linking market power to harm to competition in that market." *Id.* (first quoting *Levine*, 72 F.3d at 1551; and then quoting *Spanish Broad. Sys.*, 376 F.3d at 1073). The Eleventh Circuit has defined "market power" as "the ability to raise price significantly above the competitive level without losing all of one's business," *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983) (citing *Valley Liquors,*

14

*Inc. v. Renfield Imps., Ltd.*, 678 F.2d 742, 745 (7th Cir. 1982) (Posner, J.)). Because market power is often difficult for courts to objectively quantify, "market share is frequently used in litigation as a surrogate for market power." *Id.* In any event, "[m]arket power alone cannot be sufficient to show the potential for genuine adverse effects on competition." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1270 (11th Cir. 2015) (quoting *Spanish Broad. Sys.*, 376 F.3d at 1073). Indeed, "[a] plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground . . . such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Id.* (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)).

CTS "has failed to establish the connection between [JPW]'s power in the [woodworking-tool] market and harm to competition in that market." *Jacobs*, 626 F.3d at 1339. CTS alleges that JPW controls over fifty percent of the total woodworking-tool market within the United States and up to seventy-five percent of the market in some categories of woodworking tools. (Am. Compl. ¶¶ 16–22). Beyond that, the Amended Complaint provides no "'direct evidence of the injurious exercise of market power [such as] evidence of restricted output and supracompetitive prices' beyond stating that these conditions exist." *Jacobs*,

15

626 F.3d at 1340 (alteration in original) (citation omitted) (quoting *Rebel Oil*, 51 F.3d at 1434).

CTS speculates that JPW's conduct will "incentivize[] competing woodworking machinery and tool brands to also increase their prices." (Am. Compl. ¶ 122). But "[t]his sparse allegation is precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*." *Jacobs*, 626 F.3d at 1340. CTS "provides no basis on which a court could determine *how* harm to competition results from [JPW]'s agreements with its distributors (if such harm results at all)." *Id.* (emphasis in original). And CTS does not adequately allege that interbrand competition "has been harmed by marketwide increased prices or reduced output." *Id.* (citing *Leegin Creative Leather Prods.*, 551 U.S. at 890). Thus, the Amended Complaint "contains insufficient factual allegations to plead a plausible case that [JPW]'s retail price maintenance agreements with its distributors had anticompetitive effects on the [woodworking tools] market." *Id.* The motion to dismiss CTS's Sherman Act claim (Count 2) must be granted.

JPW also argues that CTS has failed to adequately allege that JPW's conduct "has no pro-competitive benefit or justification," as required under the rule of reason. *Spanish Broad. Sys.*, 376 F.3d at 1071. JPW's MAP policy states that it is designed to protect JPW's brand by "promot[ing] advertising practices aimed at delivering a consistent message to consumers about the superior

16

quality of [JPW's] Products." (Doc. 36-1). CTS does not directly engage JPW's argument. Thus, the Court finds that CTS's Sherman Act claim (Count 2) must be dismissed for this reason as well.

### C.    Robinson–Patman Act Claims (Counts 3 & 4)

Pursuant to 15 U.S.C. § 15(a), CTS sues JPW for unlawful price and promotional-allowance discrimination under §§ 2(a) and 2(d) of the Clayton Act, as amended by the RPA, 15 U.S.C. §§ 13(a) and 13(d), respectively (Counts 3 & 4). These claims are addressed in turn.

#### 1.    Unlawful Price Discrimination (Count 3)

Under the RPA, it is "unlawful for any person . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a). "The section does not ban price discrimination *per se*, but only non[-]cost-justified price discrimination that causes the requisite injury to competition or competitors." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1418 (11th Cir. 1990). The elements of a price-discrimination claim under the RPA are "1) that the defendant discriminated in price, discounts, or services between purchasers of commodities of like grade and quality in the course of interstate commerce; 2) that the price discrimination resulted in the requisite injury to competition or competitors; and 3) at least the approximate amount of damages." *Walker v. Hallmark Cards, Inc.*, 992 F. Supp. 1335, 1338 (M.D. Fla.

1997) (citing *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 578 (5th Cir.1982)); *see also McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir. 1988).

CTS specifically lists several of JPW's products that it claims JPW sold at discriminatory prices. (Am. Compl. ¶¶ 14, 63, 71, 73). However, JPW argues that CTS has not plausibly alleged that CTS contemporaneously purchased any JPW tools at functionally higher prices than those offered to Amazon. JPW deduces from the allegations in the Amended Complaint that CTS is asserting that JPW offered Amazon more favorable pricing during the February 2024 meeting, which occurred amid Amazon's alleged "pressure campaign." (*Id.* ¶ 61). JPW then sent CTS the March 11 email containing new proposed terms that CTS rejected, prompting JPW to stop filling CTS's orders. (*Id.* ¶¶ 61, 90–91). Thus, based on CTS's allegations, JPW argues that price discrimination could not have occurred at all because the parties ended their business relationship shortly after JPW began providing Amazon with more favorable pricing. In its response, CTS recounts the discriminatory pricing that JPW purportedly agreed to give Amazon during the February 2024 meeting, (*id.* ¶ 137; Doc. 38 at 21), and claims that JPW's discriminatory pricing structure resulted in significantly lower costs to Amazon relative to CTS, (Am. Compl. ¶¶ 139–40).

18

To show that the defendant discriminated in price, "[t]he complaining party must allege . . . that there were two sales made by the same seller to at least two different purchasers at different prices." *Pierce v. Com. Warehouse, Div. of Thompson Auto. Warehouse, Inc.*, 876 F.2d 86, 87 (11th Cir. 1989). These disparate sales must occur "contemporaneously" to state a claim for unlawful price discrimination. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006). Taking the well-pleaded allegations of the Amended Complaint as true, and noting that CTS has alleged that JPW offered Amazon discriminatory pricing while JPW was still dealing with CTS, the Court finds that CTS has alleged "enough data" to overcome the initial hurdle of plausibly pleading that price discrimination occurred in this case. *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983); *see also F.T.C. v. Morton Salt Co.*, 334 U.S. 37, 45 (1948) (explaining that to state an unlawful price-discrimination claim, the plaintiff must allege "that a seller had charged one purchaser a higher price for like goods than he had charged one or more of the purchaser's competitors").

But for the price discrimination claim to survive, CTS must allege that JPW's discriminatory discounts caused a competitive injury that is "causally connected to the alleged antitrust violation." *Walker*, 992 F. Supp. 1335, 1338 (M.D. Fla. 1997) (quoting *DeLong Equip. Co. v. Wash. Mills Electro Mins. Corp.*,

990 F.2d 1186, 1202 (11th Cir. 1993)). Although CTS alleges that JPW's price discrimination had the effect of "substantially lessen[ing] competition in the sale of the Products over a substantial period of time," (Am. Compl. ¶¶ 138, 155), more is required.

A private party who sues for damages under § 15(a) must plausibly allege an "actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co.*, 451 U.S. at 561–62. "A hallmark of the requisite competitive injury . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Volvo Trucks N. Am., Inc.*, 546 U.S. at 177 (citing *F.T.C. v. Sun Oil Co.*, 371 U.S. 505, 518–19 (1963), and *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437–38 (1983)). The Supreme Court has "also recognized that a permissible inference of competitive injury may arise" when a "favored competitor receive[s] a significant price reduction over a substantial period of time." *Id.* (citing *Morton Salt*, 334 U.S. at 49–51); *see also Falls City Indus.*, 460 U.S. at 435 ("[I]njury to competition is established *prima facie*" by plausible allegations of "substantial price discrimination between competing purchasers over time.").

CTS argues that its allegation of "lost profits from displaced sales" resulting in "substantially lessen[ed] competition in the sale of the Products over a substantial period of time," (Am. Compl. ¶¶ 138, 140, 155), "give[s] rise to a

*Morton-Salt* presumption of market injury," (Doc. 38 at 22 (citing *Morton Salt*, 334 U.S. at 45)). In *Morton Salt*, the Supreme Court considered a finding by the FTC that a business engaged in unlawful price discrimination under the RPA by offering a quantity discount system that, in practice, only large wholesalers could afford. *Morton Salt*, 334 U.S. at 41–42. The *Morton Salt* Court addressed the standard for showing the existence of a competitive injury resulting from discriminatory pricing, *id.* at 45–46, and determined there must be "a reasonable possibility that [the discriminatory pricing] may have [an anticompetitive effect]. *Id.* at 46 (citing *Corn Prods. Co. v. F.T.C.*, 324 U.S. 726, 742 (1945)). The *Morton Salt* Court concluded that the standard was met in its case because "the competitive opportunities of certain merchants were injured when they had to pay . . . substantially more for their goods." *Id.*

CTS alleges that it "lost profits from displaced sales caused by the discriminatory pricing structure in favor of Amazon." (Am. Compl. ¶ 140). CTS may be referring to Amazon's alleged listing of JPW's tools at below-MAP prices on September 19, 2023, and September 26, 2023. (Am. Compl. ¶¶ 71, 73). However, these listings occurred months before the February 2024 meeting between JPW and Amazon at which discriminatory pricing for Amazon was allegedly agreed upon. (*Id.* ¶¶ 61, 90–91). Otherwise, CTS alleges that its sales of JPW's tools had been "dramatically increasing" through the end of March

21

2024, up to and including the time at which JPW ended the parties' business relationship, (Am. Compl. ¶¶ 48, 54; Doc. 36 at 19). While CTS has plausibly alleged JPW began offering Amazon more favorable pricing in the weeks before JPW terminated CTS as a distributor, CTS does not point to any "diversion of sales or profits from a disfavored purchaser to a favored purchaser" or otherwise plausibly allege that its "competitive opportunities . . . were injured" by the discriminatory pricing at that time since its sales were still "dramatically increasing." (Am. Compl. ¶¶ 48, 54); *Volvo Trucks N. Am., Inc.*, 546 U.S. at 177; *Morton Salt*, 334 U.S. at 46.

Moreover, CTS also does not plausibly allege that Amazon received "a significant price reduction [from JPW] over a substantial period of time" because the Amended Complaint alleges that the favorable pricing for Amazon was established only a month before JPW terminated its business relationship with CTS. *See Mays v. Massey-Ferguson, Inc.*, No. CIV. A. CV187-131, 1990 WL 80673, at *3 (S.D. Ga. Apr. 26, 1990) ("Although the length of time over which the discrimination must occur has never been precisely defined, one sale on one date to one competitor cannot constitute substantial price discrimination 'over time.'"); *Falls City Indus.*, 460 U.S. at 431 (discriminatory sales occurred for over six years); *Morton Salt*, 334 U.S. at 52 (respondent was "found to have engaged" in unlawful price discrimination "for a number of years"). Thus, CTS has not

22

adequately alleged that JPW engaged in significant price discrimination between competing purchasers over a substantial period of time.

CTS claims it sustained monetary losses of "at least $3 million," (Am. Compl. ¶¶ 139–40). But CTS does not plausibly link these alleged damages to JPW's price discrimination; they appear instead to be the consequence of the termination of the parties' business arrangement after CTS rejected the terms of the March 11 email. *See Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1376 (11th Cir. 1997) ("Simply put, this is not an antitrust case but rather a breach of contract case."); *Blank v. Preventive Health Programs, Inc.*, 504 F. Supp. 416, 419 (S.D. Ga. 1980) ("While these injuries may give rise to a breach of contract claim, such damages cannot be characterized as antitrust injuries remediable by a treble damages action.").[4] The motion to dismiss CTS's claim for unlawful price discrimination under the RPA (Count 3) must be granted.

---

[4] JPW also moves to dismiss CTS's price discrimination claim on the ground that CTS does not adequately allege the discounts were not "legitimate functional discounts." (Doc. 36 at 21). CTS claims Amazon had been "causing a headache" for JPW for several months before embarking on the February 2024 "pressure campaign" to extract favorable pricing from JPW. (Am. Compl. ¶¶ 58, 79). CTS alleges that "[n]o legal justification exists for JPW's discriminatory pricing, (*id.* ¶¶ 141, 158), and that the discounts were designed to eliminate CTS as a competitive distributor of JPW's products, (*id.* ¶¶ 58–89). The Court will not dismiss CTS's claims on this basis. *See Howard v. Coonrod*, 546 F. Supp. 3d 1121, 1130 (M.D. Fla. 2021) (noting that motions to dismiss "ordinarily cannot reach the merits of an affirmative defense").

### 2. *Discriminatory Promotional Allowances (Count 4)*

JPW also moves to dismiss Count 4 of the Amended Complaint for discriminatory assistance with services or facilities under the RPA, 15 U.S.C. § 13(d). Section 13(d) prohibits manufacturers from offering special assistance to distributors with "processing, handling, sale, or offering for sale of any products or commodities manufactured . . . by such person" unless such assistance "is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." *Id*. Thus, the RPA "requires that purchasers be given an equal opportunity to participate in certain types of seller programs relating to the resale of products, such as advertising and promotional programs, and that the benefits under those programs be disbursed" on a proportional basis. *Alan's of Atlanta, Inc.*, 903 F.2d at 1423 (citing *F.T.C. v. Fred Meyer, Inc.*, 390 U.S. 341, 358–59 (1967)).

JPW moves to dismiss Count 4 on the basis that CTS "merely recites [the elements of the claim] in a conclusory fashion." (Doc. 36 at 23). In the Amended Complaint, CTS alleges that JPW paid for promotional allowances to Amazon without offering similar promotional allowances to CTS. (Am. Compl. ¶¶ 153–54). Specifically, CTS claims that JPW covered Amazon's advertising costs to sell JPW's products, (*id*. ¶ 153(a)), and provided Amazon with preferential inventory allocation, (*id*. ¶ 153(b)). CTS further alleges these promotional

24

allowances were exclusive to Amazon and were not offered to CTS. (*Id.* ¶ 154). JPW complains that CTS does not specify any further details of the alleged promotional program. However, CTS's allegations, taken as true, "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 555. The motion to dismiss CTS's discriminatory promotional allowance claim (Count 4) must be denied.

### D.    State Law Claims (Counts 5 & 6)

Finally, JPW moves to dismiss CTS's claims under FDUTPA (Count 5) and the Florida Antitrust Act (Count 6). A plaintiff may proceed under FDUTPA if they can otherwise state a claim under "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." § 501.203(3)(c), Fla. Stat. Here, CTS has plausibly alleged a violation under § 13(d) of the RPA (Count 4) and can therefore state a claim under FDUTPA. *See Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1287 (M.D. Fla. 2002). Thus, JPW's motion must be denied regarding the FDUPTA claim.

JPW also moves to dismiss CTS's Florida Antitrust Act claim (Count 6) on the basis that it must be rejected if CTS's Sherman Act claim is dismissed. "The Florida legislature has adopted the antitrust law developed by the federal courts under the Sherman Act." *Okavage Grp., LLC v. United Wholesale Mortg., LLC,*

25

No. 3:21-cv-448, 2022 WL 17478298, at *3 n.4 (M.D. Fla. July 27, 2022) (citing *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998)). Because the Court found that CTS's Sherman Act claim (Count 2) was deficient, CTS's claim under the Florida Antitrust Act also falls short. S*ee St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. 2d DCA 1984).

## IV.   CONCLUSION

For the reasons given above, it is **ORDERED** that Defendant's Motion to Dismiss (Doc. 36) is **GRANTED in part**. Counts 2, 3, and 6 of the Amended Complaint (Doc. 35) are **DISMISSED without prejudice**. Plaintiff may file a second amended complaint on or before May 22, 2025. Defendant shall respond to the operative complaint on or before June 5, 2025.  Defendant's motion is **DENIED** as to all other counts in the Amended Complaint.

**DONE** and **ORDERED** in Orlando, Florida, on May ⟋, 2025.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

26